(No. 29996.—

NORTHERN ILLINOIS COAL CORPORATION *et al.,* Appellees, *vs.* ROBERT M. MEDILL, Director of Mines and Minerals, Appellant.

*Opinion filed March 19, 1947—Rehearing denied May 19, 1947.*

GEORGE F. BARRETT, Attorney General, (WILLIAM C. WINES, RAYMOND S. SARNOW, and JAMES C. MURRAY, all of Chicago, of counsel,) for appellant.

KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, (JO-SEPH B. FLEMING, EDWARD C. CALDWELL, and THOMAS M. THOMAS, of counsel,) all of Chicago, for appellees.

Mr. CHIEF JUSTICE GUNN delivered the opinion of the court:

This is a suit brought by sixteen corporations and one partnership, engaged in strip mining of coal in the State of Illinois, who seek to enjoin the Director of Mines and Minerals from carrying out the provisions of an act regulating persons engaged in "open cut" or "strip" mining, enacted July 31, 1943, (Ill. Rev. Stat. 1945, chap. 93, pars. 162-180,) on the ground that the act is unconstitutional. The injunction was granted by the circuit court of Cook county and the Director of Mines and Minerals seeks reversal of that order by appeal.

The terms "open cut" or "strip" mining, as used in the act, refer to the process whereby the soil overlying a coal deposit is removed and the coal then mined directly from the seam thereby exposed. In the normal course of operations, the procedure is to start at one edge of the area to be mined and make a "box cut," which is simply a large trench down to the top edge of the coal seam. The material removed from the box cut is piled to the side of the cut opposite the direction in which the mining will progress; the pile thus made is called a "spoil ridge." After the coal has been removed from the floor of the box cut, a second cut is made parallel to the first, the material from the second cut being deposited in the trench left in the first cut. Following the removal of the coal from the second cut, a third cut is started, the spoil being placed in the second cut, and the process thus continued until the entire field has been mined. When the mining is finished, the field is left with a series of parallel spoil ridges, the first of which is higher than the others because it is piled on the ground rather than in a cut, and with one open

cut, which is the last one dug. The first spoil ridge may be 60 to 70 feet high; the remaining ridges are usually 10 to 20 feet above the original surface, and the final open cut is usually 50 to 60 feet deep, about 60 feet across at the bottom, and 200 feet across at the top.

The statute in question requires any person, firm, corporation, or association, engaged in open cut or strip mining, to level the spoil ridges so that the contour of the land is approximately the same as before the mining operation was begun. The leveling must be done progressively as the field is mined, so that no more than three spoil ridges are unleveled behind the open cut being used for coal removal. When the mining is completed, the operator is required by the act to level the remaining spoil ridges, except that he is not required to totally fill the final cut if the adjacent spoil ridge will not fill that cut. The act further requires every strip-mine operator to obtain a permit from the Department of Mines and Minerals as a condition precedent to operating a strip mine, and to post a bond with the Department to insure faithful compliance with the terms of the act. The Department is authorized to refuse to issue permits, or to suspend or revoke existing permits, upon failure to comply with the act. Provision is also made for a hearing to be held in connection with such refusal to issue, suspend or revoke. A fine is provided for engaging in commercial open cut mining without a permit.

Appellees allege in their complaint that they are the owners of over 30,000 acres of land in Illinois which they propose to strip mine; that they have contracts for the sale of coal yet to be mined, which contracts were executed prior to the passage of the act in question; that the area already mined, or adaptable to strip mining in Illinois, is about .092 of 1 per cent of the area of all the farm lands in Illinois; that, as of the date of the filing of the complaint, appellees were unable to obtain the equipment neces-

sary for leveling the spoil ridges in compliance with the act, because of war-time restrictions; that it is impractical to level any of the spoil ridges until the entire area is mined, because of the necessity for maintaining haulage ways over which the coal must be transported to the cleaning and preparation plants and to the railroad for shipment; that the cost of compliance with the act would wipe out the margin of profit in the operations of the strip mining companies, and render worthless their investments aggregating $31,000,000; that the restoration of the original contours will not produce productive farm land, and will make the land involved less desirable for grazing, forestry and recreational purposes, than if the spoil ridges are left alone; that 96 per cent of the strip mining companies are now engaged in long-term reclamation projects which will render the land more valuable than the leveling required by the act; that the damage to the surface of the land occasioned by strip mining of coal is similar to, and no greater than, the damage caused by shaft coal mining, or open pit mining, or quarrying of stone, sand, gravel, shale, clay and silica, although the act applies only to coal strip mines; that the act does not promote, nor is it related to the public health, order, safety, morals or welfare; that because of the foregoing facts, the act is discriminatory and, therefore, unconstitutional and void; that the act is also void because it is indefinite and uncertain and incapable of enforcement; that the act is an improper delegation of legislative power; and that appellees are without adequate remedy at law to correct the situation in which they find themselves. Appellees ask for a declaration that the act is unconstitutional, and for an injunction against the enforcement of the act by the Director of the Department of Mines and Minerals.

Appellant, answering the complaint, denied its material allegations, and asserted that the business of strip mining destroyed forever the highest and best use of the land;

and, in addition, that present methods of strip mining created breeding places for noxious insects and bacteria, thus constituting a menace to the public health, as well as disfiguring the landscape and depreciating the value of adjoining property. The appellant asserts that, for these reasons, the act is valid as a reasonable exercise of the police power of the State. These averments are denied by appellees' reply and the cause put at issue.

The cause was referred to a master in chancery to take evidence, and voluminous testimony was introduced, chiefly in support of appellees' allegations. At the conclusions of the hearing, the master filed his report and recommendations, and concluded that the act was unconstitutional as an invasion of private property without the mitigating circumstances that it is for the public welfare, and because it amounts to an unreasonable discrimination among persons in the same class. He also found that it was not unconstitutional for vagueness, for lack of reviewing power, or for a wrongful delegation of legislative power. After a hearing on the report and the objections thereto, the circuit court entered an order confirming the master's report, and finding the act to be unconstitutional and void, in that it denies appellees the equal protection of the laws, deprives them of their property without due process of law, grants special privileges and immunities, does not apply equally to all persons similarly situated, and is capricious, arbitrary and unreasonable. The order also finds the act to be uncertain, indefinite and incapable of enforcement, and an improper delegation of judicial and legislative power. The Director of the Department of Mines and Minerals is, therefore, by the order, enjoined from enforcing and carrying out any of the provisions of the act. From that order appellant has brought this appeal.

Appellant contends that the act should be sustained as a reasonable and valid public health measure. It will be

remembered that appellant, in his answer, alleged that pools of stagnant water collect in the pits left by strip mining and furnish breeding places for noxious insects and bacteria, which constitute a menace to the public health. These allegations were denied in the reply.

Appellant says that the state of the pleadings cast upon appellees the burden of proving that the pools of water were not breeding places for mosquitoes and bacteria, and that the burden was not met. The record shows that the only evidence introduced concerning this question, was the statements of two of appellees' witnesses. The first of these witnesses testified that the water in the mentioned pools was generally potable, and it would sustain life; and that like all other water, except that which has been distilled or contains carbolic acid, it supports microorganisms and contains some species of microorganisms or bacteria. The second witness testified that he thought that mosquitoes, and perhaps bacteria, would breed in the pools; that most bacteria are not harmful, but are in fact necessary; and that these pools would not breed any more bacteria or mosquitoes than stagnant water in other places. The master in chancery, in his finding of fact, concluded that if the pools were actually dangerous to the public health, as appellant contended, the State would have produced evidence of that fact, and the master, therefore, found that they were not inimical to the public welfare.

Conceding the plenary power of the legislature to enact laws for the preservation of the public health, it does not appear that the act here involved was intended to accomplish that purpose. The act requires the coal strip-mine operator to restore the property to approximately the original contour. If the land originally contained ponds or swamps, presumably they too must be restored. Furthermore, the act permits the leaving unfilled of the final cut, if the adjacent spoil ridge will not fill it, and yet this final cut is the chief place where the pools of water collect. If

the legislature was attempting to remedy the evil of mosquito and bacteria breeding ponds, the act does not so indicate. If intended as a measure to protect health, the act should have been directed against the evil which theatens to introduce sickness or disease. The rights of property cannot be invaded under the guise of a regulation for the preservation of health when such is clearly not the object and purpose of the regulation. (*People* v. *Carolene Products Co.* 345 Ill. 166; *Bailey* v. *People,* 190 Ill. 28.) If the act required the elimination, by draining or filling, of all ponds or pools of water left behind in the strip mining process, it might reasonably be assumed that it was intended for the protection of the public health, but the requirements of the present act do not appear to have a reasonable relation to that purpose.

Appellant also contends that the act is sustainable as a conservation measure. As a matter of fact, there was evidence that 96 per cent of the strip-mine operators in Illinois were already engaged in long time reclamation projects of their own, designed to make use of the mined areas without leveling the ridges. However, appellant contends that the legislature may determine, as a conservation measure, that the chief economic value of the land which is to be preserved is its value as land capable of cultivation, or as stated in his brief, "the legislature of Illinois may make a choice between cultivated or 'row' crops and forestry." There are two answers to that argument aside from the fact that this does not appear from reading the act. In the first place, the restoration of the land to its original contours is not conclusive that it will be suitable for cultivation of row crops. The evidence indicates that most of the acreage presently being strip mined is marginal land, suitable only for intermittent cultivation, and some is submarginal and not susceptible of cultivation. Restoration of such land to its original contours will not make it suitable or valuable row-crop land. As in the

case of the public health contention, the method here employed does not bear any reasonable relation to the object sought, if we assume, as appellant does, that object to be the creation of lands suitable for row-crop farming. Secondly, the State has no authority, under the guise of a conservation theory, to compel a private owner, at his own expense, to convert his property to what it considers to be a higher or better use. This is more graphically illustrated by analogy. It can scarcely be contended that the legislature could require a private individual, at his own expense, to cut down his trees, grub out the stumps, and prepare his land for cultivation of row crops. Such a requirement would obviously be a confiscation of property. Yet, if appellant's theory is correct, and it is the legislative intent to require all operators of coal strip mines, at their own expense, to resurface the mined land so that it will be suitable for row-crop farming, then the act is open to the same objection. Under appellant's theory of conservation, the forested areas which are strip mined are not to be reforested or seeded for grazing, as the owner desires, but, by legislative whim, made over into cultivated farm lands at the owner's expense.

Defendant relies on the case of *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190, as authority for the proposition that the State may, as a conservation measure, elect between agrarian and mining use of property, and decree that the former is to be preserved even at the expense of destroying the latter. In that case, the facts were as follows: A natural gas pool had been opened in northern Indiana from which certain cities were drawing fuel. The Ohio Oil Company drilled several oil wells which tapped the same reservoir, and in the production of oil, the company released considerable amounts of natural gas which were dissipated into the air and wholly wasted. The State of Indiana had previously enacted a statute prohibiting the release of the natural gas into the atmosphere and requir-

ing its storage or use. The Supreme Court of the United States upheld the validity of the Indiana regulation as being within the lawful discretion of the legislature. A perusal of the case discloses it was so decided because of the injurious effect of the oil operations upon other persons interested in the gas production by reduction of pressure in the entire area overlying the pool. In the language of the court, "It follows from the essence of their right and from the situation, of the things as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right to the detriment of the others, or by waste by one or more to the annihilation of the rights of the remainder. *Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution,* to arise from the enjoyment, by them, of their privilege to reduce to possession, and to reach the like end by preventing waste." It is apparent that the cited case differs from the case at bar, because the leaving of spoil piles on the strip-mine operator's property does not prevent the adjacent owners from enjoying the full use of their property, or waste the property to the detriment of others. Thus the necessity of protecting the rights of the collective owners, which the Supreme Court of the United States found determinative in the cited case, is not present here, and that case cannot be considered as authority for sustaining the validity of the act here involved.

But even if the act were valid as a measure designed to protect the public health, or as a conservation measure, it is fatally defective as an unreasonable descrimination against coal strip-mine operators. This court has repeatedly held that where statutes are enacted in the exercise of the police power, only those statutory classifications are

valid which are based on reasonable grounds of distinction with reference to the object of the legislation. (*Chicago Park Dist.* v. *Canfield*, 382 Ill. 218; *Wedesweiler* v. *Brundage*, 297 Ill. 228; *Starne* v. *People*, 222 Ill. 189; *Millett* v. *People*, 117 Ill. 294.) If the public health is endangered by changing the contours of the land so that pools of water will form, then anyone who so changes the contours is menacing the public health, whether he is removing coal, clay, stone, sand or gravel. Similarly, if the object desired is the conversion of land to "row" crop cultivation, then any person who so changes the contours as to make such cultivation impossible is acting contrary to the public policy and should be ordered to desist. There is no reasonable ground for distinguishing between the strip-mine operator who mines coal and any other strip-mine operator, when considered with reference to the object sought to be attained, whether that object is public health or conservation of "row" crop land. It is the method of mining employed, not the nature of the product removed, which produces the undesirable result from a health or conservation standpoint, and the object of the legislation is to prevent the use of that method. The act, by attempting to distinguish between operators on the basis of the mineral produced, thereby sets up an unreasonable classification and is, for that reason, invalid. *People* v. *Redfield*, 366 Ill. 562; *Starne* v. *People*, 222 Ill. 189; *Bailey* v. *People*, 190 Ill. 28; *Braceville Coal Co.* v. *People*, 147 Ill. 66; *Frorer* v. *People*, 141 Ill. 171.

In view of the conclusion we have thus reached, it is unnecessary to consider the other objections raised to the validity of the statute or the contentions of appellant that restoration to the approximate original contour is a reasonable requirement.

The decree of the trial court is affirmed.

*Decree affirmed.*