Mount Carmel Railroad Company, Appellant, *v.* M. A. Hanna Company.

Argued May 27, 1952. Before DREW, C. J., STERN, STEARNE, BELL, CHIDSEY and MUSMANNO, JJ.

*Michael Kivko,* with him *H. Merle Mulloy, Andrew L. Armstrong* and *Matthew D. Mackie,* for appellants.

*Robert McK. Glass,* with him *Charles B. Waller* and *Bedford, Waller, Darling & Mitchell,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, June 24, 1952:

The basic question raised by this appeal is whether or not M. A. Hanna Company, the appellee, possesses

the right to *strip mine* coal underlying the railroad of Mount Carmel Railroad Company (owner) and Reading Company (lessee) appellants herein. The court below decided that it had such right and dismissed the bill in equity seeking to restrain appellee from strip mining the coal underlying appellants' railroad. This appeal followed.

The right of appellee to strip mine the coal depends upon the interpretation of a written document dated September 29, 1891, executed by the Mineral Railroad and Mining Company (a predecessor in title to appellee, the lessee of lands in Mount Carmel Township in Northumberland County) and the Mount Carmel and Natalie Railroad Company (a predecessor in title to appellants). Under this document (variously termed a deed, grant, agreement and release) the lessee granted the railroad company a right of way over the surface of its land to "make, construct, maintain and use its said railroad" which extended approximately 5.90 miles from Natalie Junction to Natalie Colliery. The area over which the right of way was granted is shown by two maps attached to the document. The strip of land was not to exceed thirty acres of surface, and to be of a width not over thirty feet on either side of the center line shown on the maps. The lessee's term was for nine hundred and ninety-nine years, and the rights of the railroad company were for five hundred years from September 29, 1891.

The findings of fact of the chancellor concerning title were approved by the court in banc and are sufficiently supported by the evidence. The M. A. Hanna Company, appellee, became the successor to all the rights of the Mineral Railroad and Mining Company, the lessee-grantor. The fee title to the surface over which the appellants' right of way extends is vested in appellee, subject to the grant in the document dated

September 29, 1891, supra. All the rights granted to the Mount Carmel and Natalie Railroad Company became vested in the appellants. As we approve the findings of the court below establishing title, we will not recite *in detail* the chains of title. The only question of law encountered in tracing the title concerns the sufficiency of the assignment of the rights of Mineral Railroad and Mining Company to appellee. On December 24, 1913, the stockholders of Mineral, a corporation, approved the transfer of all property of the company to appellee's predecessor, but no formal assignment was executed prior to dissolution of Mineral Corporation in 1932. To cure this possible defect in title, on March 2, 1951, all parties who had owned shares in Mineral Corporation at the time of its dissolution, viz.: Pennsylvania Railroad Company and Northern Central Railway Company, joined in an assignment to appellee. Appellants argue that the Act of May 21, 1881, P. L. 30, 15 PS 3062, provides the exclusive method by which the officers of a dissolved corporation may convey assets. Appellee contends that this is an enabling act only and not a mandatory procedure. Since no creditors' rights are involved, we agree with the conclusion of the learned court below that the assignment by all those who held stock at the time of dissolution was effective to pass whatever title was still held by Mineral Corporation. "On dissolution, the legal title to land passes to the stockholders, and title to the corporate property vests in the stockholders as tenants in common and is subject to their contract if all debts have been paid and no receiver has been appointed": 16 Fletcher on Corporations (1942 ed.) sec. 8134, p. 878.

We need not review the cases on severance of estates in coal lands—the estate in the *surface,* the estate in the *coal* and the right of *surface support,* sometimes referred to as the third estate. These principles are reviewed in

*Miles v. Pennsylvania Coal Company,* 214 Pa. 544, 63 A. 1032, but have no controlling application in this case. When this document was executed in 1891, there had been no severance, and there was none until almost fifty years after the execution of the document upon which appellants base their rights. We then have the situation where a lessee of the fee grants to a railroad company the right and privilege of constructing and maintaining a railroad over a designated strip of the lessee's land. Concerning this there is no dispute. The litigation revolves about the *reservations* and *restrictions* connected with the grant. In summary: the lessee (grantor) reserved all the coal underlying the grantee's railroad, with right to remove same without liability. But the grantee railroad company was authorized, after due notice, to retain such underlying coal upon payment to the lessee of the value of the coal. It is the interpretation of the *words* of the document which determines whether the *method* of removal of the coal may be by *strip mining* or is required to be by *deep mining.*

Appellants' right of way extends in a general northeasterly direction and crosses at right angles the path of the proposed strip mining, which is approximately three hundred feet wide and through which runs a vein of coal shaped like a V. The coal is nineteen feet thick at its upper extremity (referred to as the surface outcrop) and thirty feet thick at the vertex of the V, which lies approximately two hundred and fifty feet below the rails of appellants' road. The overburden from the outcrop to the natural surface of the ground is approximately thirty feet deep, and on top of this is an artificial fill about twenty-two to twenty-four feet in depth. Thus it is apparent that strip mining will require removing the earth beneath appellants' track for a distance of about three hundred feet, to depths varying from fifty to two hundred and fifty

feet. This will make operation of the railroad impossible until the ground is back filled within a year after the mining is completed in compliance with the Anthracite Strip Mining Act of June 27, 1947, P. L. 1095, 52 PS 681.1 et seq. Testimony was adduced by appellants that because of the shape of the vein a considerable portion of the coal could be removed by deep mining without disturbing the surface at all, and relatively minor disturbances would result from deep mining the surface outcrop.

The pertinent excerpts from the document of September 29, 1891, supra, which require interpretation to determine the method of mining permitted are as follows: "PROVIDED HOWEVER, that nothing herein contained shall be held or construed as giving or granting unto the said party of the second part, its successors or assigns, any of the fossil or mineral coal, iron or other ores, or any interest in the same or any other minerals that may be found under the surface of the earth within the said boundaries of the said right of way upon the said strip of hereby granted to the said party of the second part, and it is hereby stipulated and provided that this grant is made expressly subject to the condition that the said party of the first part excepts from this grant and fully and absolutely reserves unto the said party of the first part, its successors and assigns, . . . all the said fossil or mineral coal, iron or other ores or minerals that may be found under the surface of the said tracts or parts or tracts of land, or either of them or any part thereof, with the full and free right of digging for, mining and taking away the same, at any time or times, *or in any manner or by any method of mining,* without let or hinderance of the said party of the second part, its successors or assigns, and without any compensation therefor or liability of any kind or nature whatever . . . . And the said party of the first

part *also* excepts and reserves unto itself, its successors and assigns . . . the full, free and absolute right to make and use drifts, tunnels, gangways, airways, breasts, slopes and other ways through and under the said tracts and pieces of land, as aforesaid, or any part or portion thereof, in any and every direction, for mining purposes or operations, on, under, in or through the said tracts or parts of tracts of land or any other pieces or tracts of land adjoining or near the same. And it is also hereby stipulated and expressly provided that neither the said party of the first part, its successors or assigns, . . . shall be in any way or manner, or at any time, responsible at law or in equity, either for its own, or their or either of their mining operations or workings in said mines. . . . And that the said party of the second part, . . . accepts this grant upon the express condition that the said party of the second part, its successors and assigns shall and will assume all risk of the said *surface of the ground hereby granted breaking or falling in* by reason, or in consequence of the mining, removal or taking away of the said coal or other minerals. . . .

"And this indenture further witnesseth that if any time previous to the mining of the said coal and other minerals lying under the said right of way hereby granted, . . . the said party of the second part shall give reasonable and sufficient notice to the said party of the first part, its successors or assigns, or lessees, . . . that a part or portion of the said veins or seams of coal lying under the said right of way or surface right hereby granted as aforesaid, will be necessary for the support of the surface of the ground on which the said railroad shall be constructed, as now located and marked upon said maps hereunto attached, the said coal and other minerals, so lying under the right of way, as aforesaid, shall be permitted to remain unmined

and unremoved for the support of the said surface of the ground on which the said railroad shall be constructed as aforesaid, if the said party of the second part, its successors or assigns, shall thereupon forthwith pay to the said party of the first part, its successors, or assigns, . . . the full value of the said coal or other minerals which the said party of the second part shall so request to be left unmined in the said veins or seams of coal, or which may be thereby rendered inaccessible or not profitably workable, according to the amount and quantity of coal or other minerals so required to be left unmined or rendered inaccessible as aforesaid, for the support of the surface, as the same may be ascertained and determined by the mining engineer of the said party of the first part, or its successors or assigns, . . . at such price per ton as may be agreed upon by the parties. . . .

"Provided, however, that if the said party of the second part, its successors or assigns, shall fail to pay to the said party of the first part, its successors or assigns, . . . the whole of the said sum, so ascertained, agreed upon or fixed as the value of the said coal or other minerals to be left unmined, for the support of the surface as aforesaid, within thirty days after the said sum or value shall be so agreed upon or determined as aforesaid, that then the said party of the first part, its successors or assigns . . . operating or working the mines in the said premises, or any part hereof, shall be at liberty to proceed to mine and take away all of the said coal and other minerals from the said veins or seams of coal lying under the said right of way or surface right as aforesaid, as fully and absolutely as if the said request to leave the same unmined in the said veins, for the support of the surface as aforesaid, had not been made." (all italics supplied)

It is clear beyond all question of doubt that under the grant of 1891, supra, appellee retained all coal

under appellants' right of way ". . . with the full and free right of digging for, mining and taking away the same, at any time or times, *or in any manner or by any method of mining,* without let or hinderance of the said [appellee] and without any compensation therefor or liability of any kind or nature whatever. . . ." (italics supplied) *Strip mining* is an accepted *manner* or *method* of coal mining, which, with the use of modern huge and efficient machinery, has become progressively more in vogue. Had this clause stood alone it is crystal clear—that strip mining was not prohibited.

In *Commonwealth v. Fisher,* 364 Pa. 422, 72 A. 2d 568, this Court said, p. 426: ". . . [strip mining] was the earliest known method in Pennsylvania of mining anthracite coal and was originally performed by hand; the invention and use of power shovels for the removal of the overburden was, of course, a later development, but there is no rule of law which would preclude defendant, having the right to mine the coal, from using methods for that purpose made possible by modern machinery and inventions."

Appellants contend that the document must be interpreted *as a whole.* With this we agree. The language granting unlimited mining rights "in any manner or by any method" must be read in conjunction with the clauses relating to deep mining. We do not construe this language as nullifying the previous clause. Such later clause commences with the words *"Also* excepts and reserves". Such grant is an *additional* grant and not one in *limitation. Should* deep mining methods be employed this clause provides for appellee's permission to use drifts, tunnels, gangways, etc., which might pass under appellants' right of way. Appellants, through their predecessor, expressly released the grantee from all damages, including that of *surface subsidence.*

We agree with the learned court below and cannot profitably add to what Judge FORTNEY said: "The [ap-

pellants] contend that the words 'ground breaking or falling in' relates only to deep mining. With this contention we cannot agree. The risk was assumed by [appellants'] predecessor in the mining, removal or taking away of the coal as aforesaid, which we interpret to mean *by any method of mining*. A thorough study of the terms and conditions of the grant of 1891 leaves no doubt that the parties contemplated not only surface subsidence but also surface destruction. It provides if at any time previous to the mining of the coal lying under the right of way, by anyone authorized to do so, if reasonable notice is given that a part or portion of said veins or coal lying under said right of way or surface right granted therein will be necessary for support of the surface of ground on which the railroad is constructed, or located, the coal so lying under the right of way shall be permitted to remain unmined and unremoved for the support of the said surface of the ground on which the said railroad shall be constructed. Then follows a provision for payment of the coal thus unmined and a method for determining the price to be paid. We find a further provision that upon failure to pay for the value of the unmined coal within a certain time the party then mining the coal shall be at liberty to mine and remove it from said veins lying under the right of way as if the request had not been made. The plaintiff admits (paragraph 13 of the bill) the receipt of notice from the defendant under date of May 27, 1950, of its intention to continue strip mining operations, which would occasion the destruction of the railroad. It took no advantage of any right reserved to it for the enforcement of surface support.

"[Appellants] urge that if [appellee] was restricted to the acquisition of this coal by deep mining methods it would enable [appellee] to be compensated for its coal and prevent destruction of its tracks and the subsequent hardship. To thus construe the grant would be to

make a new contract for the parties. The law will not imply a different contract from that which the parties themselves made. Here the matter of access to coal is provided by express covenants, stated in clear and unequivocal language and leaving nothing to implication."

Decree affirmed at cost of appellants.