Rochez Bros., Inc., Appellant, *v.* Duricka.

Argued May 29, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

Appeal, No. 74,

*Robert W. Smith, Jr.,* with him *Smith, Best & Horn,* for appellant.

*Joseph M. Loughran,* with him *John S. Lightcap, Jr.,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, June 26, 1953:

On July 28, 1927, the defendants, Stephen Duricka and his wife Veronica, by deed from S. W. Miller and Charles Moore, became the owners of a tract of farmland located in Derry Township, Westmoreland County, Pennsylvania, comprising 251.881 acres. The conveyance was subject to a former owner's reservation (by deed dated February 17, 1919) of all the coal in and underlying said tract (excepting 2.5 acres) as follows: "TOGETHER with the right to mine and carry away all of said coal, and with all the mining rights and privileges necessary or convenient to such mining and removal, draining and ventilating of the same, and without being required to provide for the support of the overlying strata, and without liability for injury to the said surface or to anything therein or thereon by reason of the mining and removal of all of said coal or the manufacture of the same or other coal into coke, or other products, at such places as may be selected by said second party, its successors or assigns together with the right of mining and removing under said described premises other coal or matter belonging to or that may hereafter belong to the said second party, its successors or assigns."

In addition, the grantors also expressly reserved from their conveyance to the Durickas the coal underlying the 2.5 acres (which had been excepted from the original reservation) together with the following mining rights: "The full, free, and exclusive right to enter in, upon, and under, the lands hereby conveyed for the purpose of exploring, drilling for, testing, and digging, mining, draining, storing, shipping, transporting and operating said reserved coal, either as a custom coal mining proposition or otherwise, without liability for damages to the surface, or anything therein or thereon, by reason of said operations or the failure to provide

support for the overlying strata. Said mining right to be perpetual until all of said coal has been fully removed."

The plaintiff, Rochez Bros., Inc., has now become the owner of the rights contained in the two cited reservations and seeks to extract, through the process known as strip mining, the coal to which it has title. The defendants having refused the plaintiff access to the premises for the purpose indicated, the latter filed a bill in equity to enjoin the defendants from interfering with its surface removal of the coal. The defendants filed preliminary objections setting forth that the plaintiff's mining rights did not include strip mining. The objections were sustained and the bill was dismissed. This appeal followed.

The specific question presented is whether the reservations quoted above allow the plaintiff company to remove coal through strip mining methods or whether it is restricted to shaft mining. Strip mining, as the term indicates, is the stripping away of the earth surface and the horizontal withdrawal of the mineral deposits at hand. Shaft mining involves the sinking of a vertical shaft into the ground and the developing from that point of tunnels and galleries which serve as vantage points from which to withdraw and lift the coal deposits through the shaft. Shaft mining does a minimum of damage to the outer crust of the earth; strip mining does a maximum of damage. Strip mining is effected through steam shovels and bull dozers which turn up the top layer of the earth as easily as a can opener lays bare the contents of a box of sardines.

It is obvious, in view of the surface violence, destruction and disfiguration which inevitably attend strip or open mining, that no land owner would lightly or casually grant strip mining rights, nor would any purchaser of land treat lightly any reservation of mining rights

which would permit the grantor or his assignee to come upon his land and turn it into a battleground with strip mining.

There is nothing in the two quoted reservations which would cause the defendants to assume that they had contracted to allow steam shovels and bulldozers to invade their farm. In the 2.5 acres tract, all that is conveyed is the ". . . right to enter in, upon and *under*[1] the lands . . . for the purpose of . . . mining." This phraseology contains no right to remove the overlying surface. If the grant was intended to include strip mining privileges, the immunity from responsibility for "damages to the surface . . . or the failure to provide support for the overlying strata" would be meaningless because strip mining encompasses the very tearing away of the overlying strata.

It is urged by the appellant's counsel that with respect to the mining rights appurtenant to the 249 acres of land, the plaintiff has the right "to mine and carry away *all* said coal," together with "all mining rights and privileges necessary or convenient to such mining and removal." But these words are followed with the further phrase "draining and ventilating of the same." Ventilating is a feature of *underground or shaft* mining. In strip or open mining artificial ventilation is no more needed than it is needed for a house from which the roof has been removed.

The further statement in the reservation that the grantor or his assignee shall not be liable for "injury to the surface" again presupposes underground mining because strip mining directly *intends* injury to the surface. Also, the clause "without being required to provide for the support of the overlying strata" definitely refers to shaft mining because in strip mining the exca-

---

[1] Italics throughout, supplied.

vation is precisely of the "overlying strata." Finally, the assurance "together with the right of mining and removing *under* said described premises other coal" clearly demonstrates that deep mining was intended.

The plaintiff advances the case of *Commonwealth v. Fisher,* 364 Pa. 422, to bolster its position here, but there is little similarity between the facts in that case and those before us. There the grantors reserved the rights to all mineral deposits "in or *upon* any part of the premises." They reserved the right also to "enter into and *upon* and *pass over* any part or parts of the above described premises and to explore search for and *excavate* any and every kind of ore mineral metal or coal and to dig *excavate* or penetrate any part of the said premises and at all times to have free ingress and egress." To excavate means to make a hole or cavity in, hollow out, scoop, dig or cut a hollow in, which is precisely what strip mining does. Shaft or underground mining does not embrace the concept of excavating.

In the *Fisher* case, the grantors also reserved the right "to dig mine raise and take remove and carry away any and every kind of ore mineral metal or coal which may be found or discovered in *or upon* any part or parts of the hereby granted bargained and sold land." Furthermore, the land in that case was unproductive "mountain land which has been timbered over; it is held by the Commonwealth as a game habitat; it contains no buildings, railroad lines, public highways, or improvements of any kind." The land in the case at bar is agricultural and contains rich soil, ideally fit for farming. The disposition to subject the land in the Fisher case to any and every kind of device and method for removing minerals (since there was no farmland or habitation to protect) does not exist here where the floor of the property has a use entirely apart from its subbasement.

Nor does the decision in the case of *Mount Carmel Railroad Company v. M. A. Hanna Company*, 371 Pa. 232, do for the plaintiff what is contended for by counsel. In that case the reservation of mining rights was complete and unrestricted, including "the full and free right of digging for, mining and taking away the same, at any time or times, or *in any manner or by any method of mining, without let or hindrance* . . . and without any compensation therefor or liability of any kind or nature whatever. . ."

We said in that case: "A thorough study of the terms and conditions of the grant of 1891 leaves no doubt that the parties contemplated not only surface subsidence but also surface destruction."

We also said: "It is the interpretation of the words of the document which determines whether the method of removal of the coal may be by strip mining or is required to be by deep mining." The distinction between the broad and comprehensive mining rights involved in the Mount Carmel case and the limited rights here at issue is quite obvious.

It is argued by the plaintiff that at the time the mining rights were reserved in 1919 open mining was recognized and accepted, especially in the bituminous coal fields. Therefore, the parties must have had in mind that such a mining method could and would be employed in removing the coal deposits in question. The thoughts in the heads of people who enter into contracts cannot be exposed by any cerebral strip mining method, so that we cannot say with finality what thoughts the grantors and grantees were harboring when they affixed their signatures to the conveyance in question. However, man being a reasoning animal we must assume that if they intended to speak about *strip mining* they would not use the language which applies peculiarly to *underground* mining. The parties to a contract involving the

sale of a jet plane would not speak of propeller revolutions per minute. The whole nomenclature employed in the reservations under discussion was that which applied to deep mining and not surface mining. Nor can it be logically argued, as does the plaintiff, that "had the grantor intended to restrict the grantee to the underground mining method, it would have been very simple for him to have done so in so many words." Carried to its ultimate development such an argument would mean that every contract would have to enumerate not only what it granted, but also what it did *not* grant!

The surface of the ground involved here is farm land. A farm, except in a very restricted way, is not affected by underground mining. The farmer may plough, plant and prune while miners work underneath his growing crops. But strip mining drives him from his fields as effectively as a tornado. And the damage done is not restricted to the year in which the mining occurs. Even when accomplished under the restraining influences of the Act of May 31, 1945, P. L. 1198, as amended, 52 P.S. 1396.1, the top soil is so wounded and scarred by rock, shale, gravel and unusable coal that it is rendered incapable of production for many years. No farmer would permit such a disablement of his land without specific consideration. It is clear in this case that the rights reserved and later conveyed to the plaintiff were not broad enough to include such disablement.

The order of the court below is affirmed with costs on the appellant.