## Heidt, Appellant, *v.* Aughenbaugh Coal Company.

Argued November 21, 1961. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and ALPERN, JJ.

*John B. Gates*, for appellants.

*William U. Smith*, with him *Smith, Smith & Work*, for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, January 2, 1962:

In this appeal we are called upon to determine an issue oft recurring in recent years: whether under the

terms and provisions of a lease of mineral rights strip or open mining of such minerals is permissible. In our determination of this issue we bear in mind the language of the late Mr. Justice STEARNE in *Mt. Carmel R. R. Co. v. M. A. Hanna Co.*, 371 Pa. 232, 89 A. 2d 508: "It is the interpretation of the *words* of the document which determines whether the *method* of removal of the [mineral] may be by *strip mining* or is required to be by *deep mining*."

On April 10, 1918, Mrs. Jennie McNaul et al., owners of a 170 acre tract and a 1 acre tract in Pike Township, Clearfield County, conveyed these tracts to one Harry W. Riddle. In the deed of conveyance there was an *express* exception and reservation of "all the fire clay together with the mining rights and privileges" contained in a lease for said clay which Mrs. McNaul et al. had entered into with Harbison-Walker Refractories Company (Harbison) on September 14, 1915. By virtue of various wills and conveyances, the ownership of these two tracts of land is now vested in Leonard A. Heidt and Jennie W. Heidt (Heidts), as tenants by the entireties, and the surface of said tracts of land is now occupied by John Riddle and Ellen Jean Riddle (Riddles), who have a contract to purchase the said tracts of land from Heidts.

Harbison, under its lease, deep mined fire clay under the said tracts of land from 1915 until 1926 and Harbison's rights under the lease are now vested in Aughenbaugh Coal Company (Aughenbaugh). On June 8, 1957, Carrie McNaul et al., the present owners in reversion of the fire clay under said tracts of land, made an additional lease of the fire clay to Aughenbaugh, said lease not being recorded until October 27, 1960, which was subsequent to the institution of the present litigation.[1]

---

[1] Both parties and the court below relied upon the 1915 McNaul-Harbison lease as the basic document and the terms and pro-

On or about October 1, 1960, Heidts and Riddles posted the land with "No Trespass" signs and advised Aughenbaugh that they would not permit bulldozers, power shovels, power drills and other heavy strip mining equipment to enter upon the surface of the said tracts of land for the purpose of strip mining and removing the fire clay thereunder. However, Aughenbaugh did enter upon the land and began to strip mine the surface. The surface of both tracts of land is now farm land devoted to agricultural purposes.

On November 10, 1960, Heidts-Riddles (appellants) filed a complaint in equity in the Court of Common Pleas of Clearfield County against Aughenbaugh seeking to enjoin Aughenbaugh from strip mining the premises. After answer filed and reply thereto, Aughenbaugh moved for judgment on the pleadings. President Judge PENTZ granted Aughenbaugh's motion and entered judgment on the pleadings in favor of Aughenbaugh and against appellants. From that judgment, this appeal was taken.

Determination of this controversy is dependent upon an interpretation and construction of the 1915 McNaul-Harbison lease. In the construction of this lease certain well-established legal principles must be followed. These principles were well stated recently by Mr. Justice EAGEN in *Wilkes-Barre Township School District v. Corgan,* 403 Pa. 383, 386, 170 A. 2d 97: ". . . First, it is the intention of the parties at the time of entering in thereto that governs, and such intention is to be gathered from a reading of the entire contract: P. M. & Co. v. Stephano Bros., 331 Pa. 278, 200 A. 605 (1938); Maxwell v. Saylor, 359 Pa. 94, 58 A. 2d 355 (1948). In addition, ' "Contracts must receive a reasonable interpretation, according to the inten-

---

visions of the 1957 lease are not of record, except by reference in Aughenbaugh's pleading.

tion of the parties at the time of executing them, if that intention can be ascertained from their language. (Citing cases). Where the language of a contract is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred. If one construction would make it unreasonable, while another would do justice to both parties, the latter will be adopted"': Percy A. Brown & Co. v. Raub, 357 Pa. 271, 287, 54 A. 2d 35 (1947). It is also beyond controversy, that a written document must be construed most strongly against the parties drafting it: Cities Service Oil Co. v. Haller, 393 Pa. 26, 142 A. 2d 163 (1958). It is equally well fixed in the law that a doubtful reservation or exception in a deed will be construed most strongly against the grantor and in favor of the grantee: Bundy v. Myers, 372 Pa. 583, 94 A. 2d 724 (1953); Sheffield W. Co. v. Elk T. Co., 225 Pa. 614, 74 Atl. 742 (1909). This rule applies with special force to a reservation or exception which amounts to a cutting down of the grant: Klaer v. Ridgway, 86 Pa. 529 (1878)."

The 1915 lease granted to Harbison the exclusive right and privilege "to enter upon the land of" (Mrs. McNaul et al.) "for the purpose of exploring, mining and removing fire clay". Harbison was granted "the right to the possession of so much of the surface and interior of [the] land as may be required for the safe, expeditious and economical mining and removal of . . . minerals from [the] land . . ." and the right to deposit waste and refuse on the land and Harbison's possession was to include ground for "necessary buildings, machinery, and fixtures, railway tracks, tram-

ways, wagon or other roads at most convenient grades" with the restriction that the "roadbed on surface where the tracks shall be made or laid for hauling not to exceed 30 feet in width." The term of the grant was so long as Harbison continued to mine or pay the minimum royalty, with the right in Harbison to abandon the lease by giving 60 days' written notice. The most significant provision in this lease provides: *"The right to mine to include all practical methods now in use, or which may hereafter be used,* and the use of improved machinery and fixtures or appliances for said purposes; and *the right to strip the surface for,* excavate, dig, bore, shaft, quarry and otherwise explore for and mine said minerals, with the right to remove all pillars and supports that may be left in the progress of said mining; and the lessee is hereby released from all damages or liability that may be caused to, or result to the property from the mining and removal of said minerals, or from the exercise of any of the rights granted to the lessee, whether the said injuries shall be direct or consequential." (Emphasis supplied)

The two principal methods of mining fire clay are deep mining and open or strip mining. "Strip mining is done from the surface of the earth. In general, it is performed by stripping off the earth, known as overburden, which lies over the [mineral] and then removing the [mineral] so uncovered". Mr. Justice WHITTAKER in *Parsons v. Smith,* 79 S. Ct. 656, 658, 359 U. S. 215. See also: *Rochez Bros., Inc. v. Duricka,.* 374 Pa. 262, 97 A. 2d 825; *West Virginia-Pittsburgh Coal Co. v. Strong,* 42 S.E. 2d 46, 49, 129 W. Va. 832; *Northern Illinois Coal Corp. v. Medill,* 72 N.E. 2d 844, 397 Ill. 98.

An examination of the grant to Harbison clearly reveals that the language of the grant *expressly* and *unqualifiedly* gives Harbison: (1) the right to mine fire clay by the employment of "all practical methods now

[in 1915] in use, or which may *hereafter* be used"; (2) "the right to strip the surface for" fire clay and other minerals; (3) a release from all damages caused to the surface from the mining of fire clay.

Appellants have a two-fold argument: First, that strip mining for fire clay was unknown in 1915 and, second, that other provisions of the grant, such as the restriction of Harbison's possession of the surface, the limitation of the width of any roadbed on the surface, the reference to the removal of pillars and the deposit of waste and refuse, all show an intent that the property was to be deep, not strip, mined. Assuming, arguendo, that strip mining of fire clay was unknown in 1915, the grant to Harbison permitted it *expressly* to employ any type of mining which might *"hereafter"*— i.e., after 1915—be employed or used. While we agree that this grant must be read in its entirety and that there *may* be implications from such provisions as removal of pillars and the deposit of waste and refuse that deep mining was contemplated, such implications must fall in view of the *express* grant of the "right to strip the surface" for fire clay.

Appellants rely on *Rochez Bros., Inc. v. Duricka,* supra, and *Wilkes-Barre Township School District v. Corgan,* supra. In *Rochez* the coal reservation therein contained neither an express right to strip the surface nor an option as to the method to be employed in removal of the coal, and unlike the provisions of the instant lease clearly contemplated only deep mining. Appellants urge that *Rochez* was based on the fact that the surface of the land, as in the instant case, was used for agricultural purposes and that strip mining would render such land incapable of production for many years; such was not the rationale nor decisional point in *Rochez.* In *Wilkes-Barre Township School District,* unlike the instant lease, the reservation did not clearly express the intent that strip mining was

among the methods of mining contemplated by the parties and the language of the reservation gave rise to no implication that strip mining was intended but rather the implication was that only deep mining was intended. Neither *Rochez* nor *Wilkes-Barre Township School District are apposite.*

*Walker v. Forcey,* 396 Pa. 80, 151 A. 2d 601, is more apposite. Therein the original coal lease provided the mining rights should include ". . . the right to strip the surface"; when the land was later conveyed the deed contained an exception of coal "together with such rights and privileges, including stripping of the surface", as granted in the original lease; a later lease granted mining rights ". . . either by surface strip or underground mining methods." In a per curiam opinion we affirmed the action of the lower court which held the lessee under the coal lease had the right to go upon the land and strip mine the coal. See also: *Buchanan v. Watson* (Ky.), 290 S.W. 2d 40.

In *Mt. Carmel R. R. Co. v. M. A. Hanna Co.,* supra, 371 Pa. 232, 89 A. 2d 508, this Court considered whether the M. A. Hanna Co. (coal company) under an exception contained in a grant made in 1891 to Mt. Carmel R. R. Co.'s predecessors in title (railroad company) had the right to *strip mine* the coal underlying the railroad.[2] Under the pertinent language of the reservation the coal company reserved unto itself all the coal or minerals that may be found "under the surface" of the land "with the full and free right of digging for, mining and taking away the same, at any time or times, *or in any manner or by any method of mining"* with-

---

[2] The Court in its opinion recognized that, if strip mining were permitted, it would require removing earth beneath the railroad company's tracks for a distance of about 300 feet to depths varying from 50 to 250 feet and would make operation of the railroad impossible until the ground was backfilled within a year after completion of the mining as required by statute.

out hindrance by the railroad company. As in the instant situation, the surface owner assumed the risk of the surface being injured by the mining. The Court said (pp. 239, 240) : "It is clear beyond all question of doubt that under the grant of 1891, supra, appellee retained all coal under appellants' right of way '. . . with the full and free right of digging for, mining and taking away the same, at any time or times, *or in any manner or by any method of mining,* without let or hindrance of the said [appellee] and without any compensation therefor or liability of any kind or nature whatever . . . .' (italics supplied) *Strip mining* is an accepted *manner* or *method* of coal mining, which, with the use of modern huge and efficient machinery, has become progressively more in vogue. Had this clause stood alone it is crystal clear—that strip mining was not prohibited." From a reading of the lease as an entirety the Court concluded the other provisions did not nullify the express reservation of employing "any method of mining". In the instant case, Aughenbaugh under the lease has the "right to mine" and such "right to mine" is expressly stated to include "all practical methods [of mining] now [in 1915] in use, or which may hereafter be used"; in *Mt. Carmel* the coal company reserved the "right to dig for coal" and such "right to dig" included "any manner or by any method of mining". The difference between the present language and the language in *Mt. Carmel* is a difference without a distinction. *Mt. Carmel* not only is apposite but is controlling in the present situation.

Appellants complain that to permit strip mining of the premises will destroy its utility for agricultural purposes.[3] While such result is most regrettable yet

---

[3] In this case it is to be noted, although in no sense controlling, that the surface of the premises herein in question may in "the relatively near future" be the site of the construction of a dam by the United States Army Engineers which will inundate the premises.

appellants and their predecessors in title knew or should have known that in the original conveyance of 1915 and all subsequent conveyances of the premises the right to "strip the surface" for fire clay was expressly reserved to Harbison and its successors or assigns. Such knowledge, actual or constructive, on appellant's part mitigates the strength of their complaints.

In 1915 the parties expressly provided that Harbison should have the right to strip for fire clay. We cannot and should not modify or alter the intent of the parties to this lease. In the language of the lower court in *Mt. Carmel* adopted by this Court: " 'To thus construe the grant [i.e., prohibit strip mining] would be to make a new contract for the parties. The law will not imply a different contract from that which the parties themselves made. Here the matter of access to coal is provided by express covenants, stated in clear and unequivocal language and leaving nothing to implication.' "

Judgment affirmed.