New Charter Coal Company, Appellant, *v.* McKee.

308

Argued March 20, 1963. Before BELL, C.J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

reargument refused July 9, 1963.

*John W. Giesecki,* with him *Merritt H. Davis,* for
appellant.

No argument was made nor brief submitted for
appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, June 5, 1963:

By virtue of a deed dated June 2, 1903, the appellant, New Charter Coal Company's (New Charter) predecessor in title acquired all the coal to be found under the lands now owned by the appellees (McKees) with a reservation of one vein of coal more precisely described herein.

New Charter sought by means of an action in equity a determination that it is entitled to remove its coal by the open pit or strip method of mining and to restrain the McKees from preventing the removal of its coal by such method. The Court of Common Pleas of Clarion County refused New Charter's prayer and from such decree New Charter now appeals.

McKees' predecessors in title in the 1903 deed conveyed to New Charter's predecessor in title all the coal—with the exception of one vein of coal—under land in Clarion County. The following are the pertinent provisions of the 1903 deed:

". . . ALL the coal (except that hereinafter reserved) lying or being in or upon all those . . . two pieces or parcels of land situate . . . in the Borough of Sligo, County of Clarion, State of Pennsylvania, bounded and described as follows, to-wit: [in the deed there is a metes and bounds description of the two parcels of land].

"Nevertheless, excepting and reserving out of the operation of the above conveyance to [McKees' predecessors in title], their heirs and assigns, all the vein of coal lying above the limestone and otherwise known as the 'Lower Kittanning Coal Vein.'

"Also reserving to ['McKees' predecessors in title'] the right to drill for oil and gas on the premises hereby conveyed.

"Together *with the right of egress, ingress, and regress into, upon, through, over, along and across the*

*said tract of land for the purpose of examining and searching for, and of mining,* manufacturing and removing the same and other coal now opened or which may hereafter be acquired on other lands by [New Charter's predecessor in title], its successors and assigns, and for these purposes to build roads, and drains upon and under the surface of the said lands, and to erect chutes, tipples, buildings and other structures with the necessary curtilage as may be necessary and proper for the convenient use and work of the mines or works in connection therewith, with the right to deposit dirt or waste of the said mines or works upon the surface convenient thereto.

"And [McKees' predecessors in title] for themselves, their heirs and assigns do hereby remise, release and forever discharge [New Charter's predecessor in title] his heirs and assigns, of and from any and all damages to the surface of the said lands and waters therein and thereon and the buildings and improvements now or which may hereafter be erected thereon, which may result to [McKees' predecessors in title], his heirs and assigns, by reason of *digging and removing all and every particle of said coal.*

"To Have and to Hold the said coal and mining rights with the hereditaments and premises thereby granted or mentioned and intended so to be, with the appurtenances unto [New Charter's predecessor in title], his heirs and assigns, to and for the only proper use and behoof of [New Carter's predecessor in title], his heirs and assigns forever." (Emphasis supplied.)

Approximately 99 acres in two tracts of land in Clarion County are involved; the larger tract's area is about 83 acres of which approximately 30 acres are cleared and the smaller tract consists of about 16 acres of wholly unimproved land. Some, at least, of the cleared land on the larger tract is cultivated by a lessee of McKees but there are not, and never were, any

buildings on either tract. The coal belonging to New Charter—the Clarion or lower vein—underlies 50 acres of the larger tract (including the cultivated portion thereof) and all of the 16-acre tract. The coal reserved to McKees—the Lower Kittanning vein—apparently now is found only under about 10 acres of the 16-acre tract and lies between the Clarion vein and the surface.

New Charter's predecessor in title mined the Clarion coal under both tracts by deep mining methods until about the year 1920. The McKees have recently given a lease to strip mine the Lower Kittanning vein to a third party. The Lower Kittanning coal under the 16-acre tract is strippable by present methods but the Clarion coal under that tract lies too deep for strip mining. However, the Clarion coal under the 83-acre tract is strippable by present methods.

This is certainly not a case of first impression in this Commonwealth. Modern machinery has made strip mining on a large scale possible and it has rendered feasible the removal of coal that could not have been removed by deep mining methods. We can assume that in many cases strip mining is the least costly method of removing coal if we are not rash in assuming that business men will not deliberately choose a more expensive mining method and indulge in litigation to defend or assert their right to strip mine as the many cases that have come before this Court on this subject attest. We entertain no doubt that the machinery used in strip mining will continue to improve and that it will be possible in the future to delve ever deeper under the surface for coal than is now possible using this method.

Because strip mining wreaks havoc on the land it properly and understandably evokes an emotional response from conservationists and nature-lovers. It evokes an even deeper emotional response from those

who have in the past sold their mineral rights in the expectation that the damage to the surface would be minimal and now realize that, if the owner is allowed to strip mine, the surface will be utterly destroyed for many years. However, the law of contract does not and cannot take heed of emotions; otherwise, the emotions of the judge would ever be the deciding factor and chaos the result. The law demands of every man who bargains with another that he should do so only after due reflection of the possible consequences of his bargain and if he misjudges the consequences that could have been expected by a reasonably intelligent man, he cannot rely on the law to remedy his fecklessness. Absent some legally recognized infringement of the law of contract by one party, the law will not reform a written contract so as to make a contract for the parties that they did not make between themselves and certainly never to rescue a party who did not reasonably foresee the consequences of his bargain.

If a person grants a portion of his property to another and the grant is susceptible of more than one interpretation, the words of the grant are to be construed most strongly against the grantor and more favorably to the grantee (*Cities Service Oil Co. v. Haller,* 393 Pa. 26, 142 A. 2d 163; *Bundy v. Myers,* 372 Pa. 583, 94 A. 2d 724; *Klaer v. Ridgway,* 86 Pa. 529; 16 Am. Jur. 530) unless, of course, the grantee drafted the grant and was therefore responsible for the ambiguity. Similarly, if a grant reserves something to the grantor, the reservation is construed more favorably to the grantee: *Klaer v. Ridgway,* supra.

"It is well established in Pennsylvania that the owner of the surface land has a proprietary right to support of the surface; it is equally well settled that that right may be waived either expressly or by implication: . . ." *Commonwealth v. Fitzmartin,* 376 Pa. 390, 395, 102 A. 2d 893. A perusal of the quoted

portion of the deed in this case demonstrates without a doubt that the McKees waived their *right to support* of the surface and gave to New Charter the right to remove "all and every particle of said [Clarion] coal" without responsibility for damage to the surface caused by removal of the coal thereunder.

Where there is a clear right to deep mine coupled with a waiver of the right to support of the surface one does not have to be a mining expert to deduce that the owner of the coal has the power to sink as many shafts as he chooses and to come as close to the surface as he chooses to dig and remove "all and every particle of the coal" granted to him, without any responsibility as to the effect of his operations on the usability of the surface.

If the mining powers contained in the quoted portion of the deed stood alone it might well be held that New Charter was given the right to strip mine on the authority of *Commonwealth v. Fitzmartin,* supra, where the granting language was quite similar to that used here, though not as strong as there was no grant of a right to "dig" the coal. In *Commonwealth v. Fitzmartin,* moreover, the right to mine the coal was contained in a reservation, thus calling for a construction against the reservation, whereas here the mining rights exist by grant, calling therefore for a construction against the McKees.

The court below adverted to the fact that some of the surface is in cultivation and that its use for that purpose would be destroyed by strip mining. For some time it was apparently thought that our decision in *Rochez v. Duricka,* 374 Pa. 262, 97 A. 2d 825, was authority for the proposition that the use to which the surface was being put at the time of the grant *automatically* foreclosed the right to strip mine if that usage was of a valuable nature. It is now established that that was not the ratio decidendi of *Rochez;*

*Rochez* was decided simply on the grounds that the wording of the mining powers did not support an interpretation other than that of giving the right to deep mine: *Walker v. Forcey,* 396 Pa. 80, 151 A. 2d 601; *Heidt v. Aughenbaugh,* 406 Pa. 188, 176 A. 2d 400. See also: *Mt. Carmel R. R. Co. v. M. A. Hanna Co.,* 371 Pa. 232, 89 A. 2d 508.

Nor do we agree with the court below in distinguishing *Fisher*[1] and *Fitzmartin,* supra, on grounds that the word "excavate" used in the deeds in those cases has a different meaning from the word "dig" used in the deed before us. Webster's Unabridged Dictionary defines "excavate" as "to dig out and remove". Even without lexicographical authority we do not think that fine semantic hairs should determine the rights of litigants in this day and age.

However, it is not enough that the wording of the mining rights supports a construction that strip mining is allowable. As we said in *Commonwealth v. Fitzmartin,* supra, at page 393: "Where a deed or agreement or reservation therein is obscure or ambiguous, the intention of the parties is to be ascertained in each instance not only from the language of the *entire written instrument* there in question, but also from a consideration of the subject matter and the surrounding circumstances: [citing cases]." (Emphasis supplied.)

In *Wilkes-Barre Township School District v. Corgan,* 403 Pa. 383, 170 A. 2d 97, a case involving the power to strip mine under a reservation, we said (page 386): ". . . In construing a deed or a contract, certain general principles must be kept in mind. First, it is the intention of the parties *at the time of entering in thereto that governs,* and such intention is to be gathered from a reading of the entire contract: [citing cases]. In addition, ' "Contracts must receive a reason-

---

[1] *Commonwealth v. Fisher,* 364 Pa. 422, 72 A. 2d 588 (1950).

able interpretation, according to the intention of the parties at the time of executing them, *if that intention can be ascertained from their language.* [citing cases]. Where the language of a contract is contradictory, obscure, or ambiguous, or· where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary and such as prudent men would naturally execute, *while the other makes it inequitable, unusual or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.* If one construction would make it unreasonable while another would do justice to both parties, the latter will be adopted" ' :[2] [citing cases]."

A reading of the instant deed in its entirety indicates that the McKees retained a vein of coal which lay between New Charter's coal and ·the surface. The record clearly reveals that the Lower Kittanning reserved coal is to be found under 10 acres of the smaller tract and there is no evidence to show with any certainty that no Lower Kittanning coal "lying above the limestone" was not to be found on the larger tract at the time of the execution of the deed and the deed does not limit the reservation to Lower Kittanning coal on the smaller tract.

While it is true that a reservation or exception in a deed will be construed against the grantor *(Wilkes-Barre Township School District v. Corgan,* supra, at page 387) it is equally true that this reservation and exception must be taken into account when attempting to interpret the deed as a whole and glean the· intention of the parties therefrom.

In the light of the reservation of the vein lying between the granted coal and the surface, it does not seem reasonable that McKees' predecessors in title

[2] Emphasis supplied.

could have intended that the granted coal would be abstracted by strip mining methods which necessarily would involve removing any reserved coal lying between it and the surface without making some provision whereby the Lower Kittanning coal would be separated from the other strippings. McKees' predecessors in title would have been not merely foolish but irrational, if strip mining had been intended, in making such a grant. It is evident, therefore, that though the wording *per se* of the mining powers and rights might support construction of a right to strip mine, a reading of the entire deed to resolve its obscurity and ambiguity on the subject of strip mining forces the conclusion that strip mining could not have been within the contemplation or intention of the parties at the time of the execution of the deed.

Though not controlling, we find further corroboration for our conclusion from the fact that the deep mining method was used until 1920, 17 years after the grant, although New Charter now strongly insists that strip mining was in widespread use in the area at the time of the grant.

Decree affirmed.