446 A.2d 1280

**FELMONT OIL CORPORATION, Appellant,**

v.

**Martin M. CAVANAUGH and Mary Louise Cavanaugh.**

Superior Court of Pennsylvania.

Argued Oct. 23, 1978.

Filed March 5, 1982.

Reargument Denied July 21, 1982.

Petition for Allowance of Appeal Denied Sept. 13, 1982.

Beverly A. Gazza, Indiana, for appellant.

George A. Conti, Jr., Greensburg, for appellees.

Before CERCONE, President Judge, and WATKINS and HOFFMAN, JJ.

CERCONE, President Judge:

Appellant, Felmont Oil Corporation (Felmont Oil) filed a complaint in equity to enjoin appellees, Martin and Louise Cavanaugh (Cavanaughs) from preventing Felmont Oil's construction of a pipeline across certain property owned by the Cavanaughs in Indiana County. Felmont Oil claims the right to locate the pipeline on the Cavanaughs' property pursuant to a certain oil and gas lease executed in favor of Felmont Oil by Tirza Steffy, the Cavanaughs' predecessor in title. The lower court en banc, after hearings, decree nisi and exceptions filed, entered a final decree denying Felmont Oil's claim. After careful review of the facts and legal issues, we reverse the lower court's final decree.

The facts of this case are as follows. In 1965 the Cavanaughs' predecessor in title, Tirza Steffy, conveyed to Felmont Oil the oil and gas rights under a lease, whose relevant parts provide:

1. RIGHTS GRANTED. The Lessor does hereby grant, demise, lease and let unto the Lessee and the Lessee does hereby take the Premises for the purpose and with the exclusive right of prospecting, exploring, mining and operating thereon for oil, gas and all other liquid and gaseous hydrocarbons; the right of ingress, egress and regress to, upon and over the Premises; the exclusive right to introduce, store and withdraw gas in and from any stratum underlying the Premises, as provided in Para-

graph 10 hereof; and *in connection with such operations by the Lessee on the Premises and on neighboring lands, the right to install and maintain lines to convey water, oil, steam, electricity, air and gas, to, from over or across the Premises,* the right to build roads, tanks, stations and structures on the Premises, the right to take and use free of charge sufficient water, oil and gas from the Premise for such operations, the right to remove at any time during or within a reasonable time after the termination of this lease all machinery, structures, piping and fixtures placed on the Premises, and also such other rights and privileges as are necessary or convenient for conducting such operations.

\*    \*    \*    \*    \*    \*

4. UNITIZATION (POOLING). *Lessee may at any time unitize or pool and consolidate this lease,* in whole or in part, as to any stratum or strata, *with lands adjacent to or in the immediate vicinity of the Premises, so as to constitute a unit or units* not exceeding in area the acreage prescribed or required in any Federal or State law, order, rule or regulation for the drilling or operation of one well.... *Drilling, mining or reworking operations upon,* or production of oil or gas from, or existence of a shut-in gas well on *any part of such unit shall be treated for all purposes hereunder as such operations upon or production from or such a shut-in gas well on the Premises, whether occurring before or after the creation of the unit.* Upon production from any part of such unit, Lessor shall be entitled to royalties calculated as follows: There shall be allocated to this lease, a fractional part of all production from the unit as constituted at the time of such production in the ratio that the number of acres of this lease included in the unit bears to the total number of acres then included in the *unit,* and Lessor shall be entitled to royalties as provided in this lease upon such fractional part of such production, and no more....

Subsequent to the execution of this lease, Felmont entered into a Model Form Operating Agreement on November 5,

1969, with several other companies to develop and operate as a unit certain designated lands (not including the Cavanaughs' property) which these several companies held in Indiana and Cambria Counties. This area was designated the Pineton Field. Felmont Oil was to be the operator of the Pineton Field in full control of the drilling and operating work for all the oil and gas well operations in the Pineton Field.

Subsequent to the execution of the Operating Agreement, the Commissioner of Pennsylvania Oil and Gas Conservation Commission (Commission) issued an order in 1970 designated as Spacing Order No. 10, pertaining to the development of the aforesaid Pineton Field. The Spacing Order was issued in accordance with the Pennsylvania Oil and Gas Conservation Law, 58 P.S. § 401 et seq.; the objective being to bring about an orderly program for the development of all oil and gas production in Pennsylvania. In pursuit of this objective the Commission divided the properties in the Pineton Field into 19 units known as drilling units 1 through 19.[1] Gas drawn from any tract of land or leasehold in a unit was to be considered as drawn from the entire unit, and consequently, each owner of a tract of land in the unit would share in the royalties in proportion of the ration his land bore to the area in that unit as a whole. That is, gas produced within a unit was to be "treated as entirety for such unit" and each tract owner in the unit would share royalties in proportion to his ownership even though gas or oil was not drawn from his particular tract of land in the unit.

In May of 1974, the Cavanaughs purchased the property at issue from Tirza Steffey. Cavanaughs' property is included in the Pineton Field and is subject to Commission's Special Order No. 10. Thirty-three acres of Cavanaugh's property

1. Each unit contains more than one tract of land or leasehold, and the Commission order provided that only one well could be drilled in each unit, the effect being to integrate the natural gas and royalty interests of lessors in each of these drilling units.

are in Drilling Unit No. 3 and 14 acres in Drilling Unit No. 15.[2]

Subsequently, on November 16, 1977, the Spacing Order was amended by Modification Order and two additional drilling units, Drilling Unit No. 25 and Drilling Unit No. 26, were added.

In accordance with the oil and gas lease which gives Felmont Oil pipeline rights enumerated in paragraph one of the lease, Felmont Oil notified the Cavanaughs in 1977 of its intention to construct a pipeline across a portion of their property to transport gas produced from wells located in Drilling Unit No. 16 and 26. Felmont Oil intended to join a proposed four inch line with a six-inch line presently crossing the Uriah Sites Tract and which transport gas from other wells including gas from Drilling Unit No. 3 of which Cavanaughs' property is a part and for which they receive royalties.

After a strenuous effort to come to some agreement covering the pipeline, the Cavanaughs ultimately refused Felmont Oil the right to lay the pipeline across this property in Drilling Unit No. 3 despite the claim of Felmont's right under the lease and this case is now before us.

Basically, the issue in the instant case turns on the interpretation of the phrase "operations . . . on the Premises and on neighboring lands," since the lease provides that the lessee may construct pipelines on the leased premises "in connection with such operations by the Lessee on the Premises and on neighboring lands." The basic rule of construc-

---

**2.** In addition, the Cavanaughs owned another 47 acres of land in Unit 3 but had no ownership or royalty interest in the gas and oil underlying that property which was called the Uriah Sites Tract.

In 1970 a gas well was drilled by Felmont Oil on the Uriah Sites Tract in Drilling Unit No. 3. This well was in production when the Cavanaughs purchased their property in Drilling Unit No. 3 and they began receiving royalty payments as a result of the production of oil from the well located on Drilling Unit No. 3 even though they had no royalty interest in the Uriah Site Tract. This was so, as we stated, because every lessor of land in a given drilling unit received royalties for gas produced in any tract of land in the unit.

tion for interpreting contracts was stated thusly by the Supreme Court:

> In construing a deed or contract, certain general principles must be kept in mind. First, it is the intention of the parties *at the time of entering in thereto that governs*, and such intention is to be gathered from a reading of the entire contract. In addition, " 'contracts must receive a reasonable interpretation according to the intention of the parties at the time of executing them, *if that intention can be ascertained from this language.* Where the language of a contract is contradictory, Obscure and ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary and such as prudent men would naturally execute, *while the other makes it inequitable, unusual or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.* If one construction would make it unreasonable while another would do justice to both parties, the latter will be adopted.' "

*Wilkes-Barre Township School District v. Corgan*, 403 Pa. 383, 386, 170 A.2d 97, 98–99 (1961) (citations omitted) (footnote omitted) (emphasis in original). *See also New Charter Coal Co. v. McKee*, 411 Pa. 307, 314–315, 191 A.2d 830 (1963).

Turning now to the part of the contract at issue, if this contract is read in terms of "the time of entering in thereto", then the interpretation of paragraph one of this lease is simplified. At the time that this lease was written, there had not yet been any unitization in this area, therefore, for the present, we will put to one side the fact of unitization. The phrase to be considered relevant at the time the contract was entered into reads: "in connection with such operations by the Lessee on the Premises and on neighboring lands, the right to install and maintain lines to convey . . . gas, to, from over and across the Premises. . . . "

The term "neighboring property" has been defined in Ballentine's Law Dictionary (3rd ed. 1969) as "adjoining property or property in the immediate vicinity." Another

source has defined "neighboring" as "A word of indefinite meaning which may have either a narrow or a broad significance, depending on the circumstances and the subject matter. It is defined as meaning situated or residing near by; being in the vicinity; adjacent." [3] Similar definitions have been proposed by various courts in zoning cases. *See* e.g. *Bohannan v. City of San Diego*, 30 Cal.App.3d 416, 106 Cal.Rptr. 333, 336 (1973); *Loichot v. Allstate Development Corp.*, 33 Ohio App.2d 121, 292 N.E.2d 923, 926 (1963). In like manner, "adjacent" has been defined as "neighboring", "near to" or "close by", but not necessarily "contiguous", "touching" or "adjoining". *See* e.g., *Sonora Elementary School Dist. v. Tuolomne County Bd. of Ed.*, 239 Cal.App.2d 824, 49 Cal.Rptr. 153, 156.

The unitization of the Pineton Field by the Pennsylvania Commission does not change the meaning of "neighboring lands" under the lease. Paragraph four of the lease provides: "Lessee may at any time unitize or pool and consolidate this lease . . . with lands adjacent to or in the immediate vicinity of the Premises, so as to constitute a unit or units . . ." There is no reference in paragraph four of the lease regarding "neighboring lands." This paragraph merely provides that unitization will change the method by which royalties are calculated. On this point, the lease reads: "Drilling . . . or production of . . . gas from or existence of a shut-in gas well on any part of such unit shall be treated for all purposes hereunder as such operations upon a production from or such a shut-in gas well on the Premises, whether occurring before or after the creation of the unit." There follows a discussion as to how royalties will be divided in that event.

The court below took the above language into consideration and concluded that the term "neighboring lands" refers only to other property included in the drilling unit in which the Cavanaughs' property is located. The court reasoned that since the terms of the lease indicate that the Tirza Steffy, as lessor, intended to get paid for any rights given to

**3.** 66 C.J.S. 3 (1950) (footnote omitted).

the lessee, that the term "neighboring lands" must include only lands within the drilling unit "since the lessor would receive royalties from wells located in this area, but not from wells located in other drilling units." In so reasoning, we find that the equity court has overlooked other important aspects of the contract.

In paragraph one of the contract, the terms specify that pipelines may only be built across the leasehold *"in connection with"* other specified operations, which operations include prospecting for gas and storing gas on the premises. Although strictly speaking, the lessor does not get paid for allowing Felmont to prospect for gas on the leasehold, however, such prospecting is part and parcel to the pumping of gas from the premises, or any part of the unit, for which the lessor does get a royalty. Similarly, the lessor receive compensation for any gas stored on the premises. Furthermore, in the event that the lessor is not receiving royalties for production of gas from the unit or rental for gas storage on the premises, then the lessor is to receive delay rental. Since the pipeline may only be built "in connection with" the above activities, it is apparent that at no time will there be a pipeline across the premises when the landlord is not receiving some amount of income from the tenancy. While it is true, as the equity court noted, that the Cavanaughs would not be getting a royalty specifically for the presence of piping across their property, this is not inconsistent with other parts of paragraph one, in which the lessor grants to Felmont without specific compensation the right to "prospect, explore and operate thereon" for gas and the right of "ingress, egress and regress" to, upon and over the Premises."[4]

Accordingly, we reverse the equity court and find that appellant Felmont does, under the Oil and Gas Lease, have the right to install the pipeline at issue.

4. These rights are granted to Felmont for the token consideration of one dollar.