## Mitchell Energy Corp. v. Stagl

*Paul D. Shafer, Jr.,* for plaintiff.
*Russell L. Schetroma,* for defendants Stagl.
*Jack Gornall,* for defendant Rogers.

WALKER, *J.*, February 23, 1983 — In essence all parties agree in this case that what they really want is a declaratory judgment construing paragraph 6 of certain oil and gas leases and, particularly, construing the phrase "producing gas well" as contained therein. We have arrived at this point, however, by a rather circuitous procedural route.

This case was commenced on October 30, 1981 by the filing of a praecipe for summons in equity. At the same time plaintiff filed a petition for preliminary injunction and requested a hearing which was fixed for November 2, 1981. On November 16, 1981, we entered a preliminary injunction prohibiting defendants from maintaining connections to certain gas wells owned or operated by plaintiff and imposing a number of conditions on plaintiff. One of the conditions imposed upon plaintiff was the requirement they reconnect defendants' lines to the natural gas wells at the earliest possible time that it was safe to do so and make all necessary additional adjustments to the defendants' appliances.

To this date, no complaint has been filed, and, of course, no answer. Admittedly the petition for preliminary injunction is written in such a manner that it could almost be called a complaint, but it is not a complaint and there has, therefore, been no need for an answer, and thus some of the issues have not been clearly framed.

The matter is now before the court on a petition of defendants for a rule to show cause why plaintiff should not be found in contempt for failing to comply with the conditions contained in the preliminary injunction. The petition itself alleges two areas in which defendants assert that plaintiff is in default. First, that plaintiff has not reimbursed petitioner for certain alternative fuels used in the absence of the availability of natural gas and second, that plaintiff

has refused to reconnect defendants to the natural gas wells. As to the requirement that plaintiff reconnect defendants to the natural gas wells, we believe we are in a position to make a determination. As to the reimbursement for alternative fuel, we are not. The preliminary injunction simply provided that in the event it was ultimately determined that defendants were entitled to natural gas under their reservation clause during some period of time when they were not permitted to connect to the wells, then some reimbursement would be determined on an equivalent basis. In the petition for preliminary injunction, plaintiff has asserted that for various reasons these defendants are not entitled to any free gas. As to defendant, Rogers, the issue of his entitlement to free gas vis-a-vis his immediate predecessor in title has been determined in a separate action (Rogers v. Abbott v. Mitchell, No. EQ. 1982 — 14) which decision we believe is res judicata as to the parties to this action. However, since we have not even completed the pleading stage as to whether or not the parties are or were entitled to free gas during some period in the past, we do not believe we could find the plaintiff in this action in contempt for failing to pay for gas, the obligation for which has never been determined.

It may be, however, that our determination in connection with the requirement that defendants be reconnected to the gas wells will give sufficient guidance to the parties to enable them to resolve those unresolved issues.

Although this action involves two separate oil and gas leases, they are identical in language in all respects with the exception of the fact that in paragraph 6 of the Rogers lease there is a reservation of 300,000 cubic feet of gas per annum for domestic use and in the Stagl lease the reservation is only

200,000 cubic feet per annum. Thus, any discussion concerning the construction of these leases will be the same in each instance. Paragraph 6 of the leases provides for a reservation of gas for domestic use "at any producing gas well". The parties have stipulated as to essential facts that give rise to the problem of construction of this phrase.

The stipulation of facts as filed relates only to the Stagl well. The court is advised that a similar stipulation relating to the Rogers well will be filed, but since it is not yet a part of the record, we will couch our discussion in terms of the Stagl well, and in the event a further memorandum is required once the stipultation of facts relating to the Rogers well has been filed, we will supplement this discussion in that manner.

The facts particularly relevant to the present discussion indicate that the Stagl well was completed for all practical purposes on January 22, 1981. The stipulation further provides that at that time the well was "capped". It is not entirely clear whether the parties by stipulating that the well was capped means that it was completed with a Christmas tree and the valve simply shut off or means that it was capped without the addition of the necessary valves and fittings that would constitute the Christmas tree. We assume, however, that there must have been some sort of fittings at the wellhead since the stipulation further indicates that as of March, 1981, the landowners began removing gas from the well for use in their dwelling. This connection was later enjoined because we were convinced that it constituted a safety hazard for all parties concerned.

On March 16, 1982, the well was connected to a collection line operated by Cardinal Oil for transmission to Columbia Gas Transmission Lines. The first gas was actually marketed from the premises to Co-

lumbia Gas on April 13, 1982. The well was then again shut in on April 21, 1982 by reason of lack of market. Although not a part of the stipulation, it was indicated by counsel during the argument that in the future the well may be in or out of production intermittantly depending upon Columbia Gas's need to purchase gas. From these facts we are asked to determine when the well became a producing well and whether it continues as a producing well whether or not at any particular moment gas is actually being produced for sale off the premises.

Given the number of producing gas wells, there are in the United States and the fact that probably a vast majority of them contain some sort of free gas provision for the landowner, it would seem that such clauses would have been construed by the courts on many occasions. However, neither the diligence of counsel nor our own research has led us to any reported case which squarely rules on the issue presented. The basis rule in construing contracts is that the intention of the parties at the time of entering into the contract governs and that intent must be gathered from a reading of the entire contract. A contract must be given a reasonable interpretation in accordance with the intention of the parties. Felmont Oil Corporation v. Cavanaugh, 300 Pa. Super. 520, 446 A.2d 1280 (1982); Bito Bucks in Potter, Inc. v. National Fuel Gas Supply Corp., 303 Pa. Super. 208, 449 A.2d 652 (1982). Some other portions of the lease should be examined in the process of construing paragraph six. Paragraph three, the royalty clause, provides for a shut in royalty in the following language:

"Lessee shall pay lessor a royalty at the rate of Fifty Dollars per year on each gas well while, through lack of market, gas therefrom is not sold or used off the premises, and while said royalty is

so paid, said well shall be held to be a paying well under paragraph 2 hereof."

It is, therefore, obvious that the parties contemplated the possibility that a well capable of producing gas might be shut in through lack of market. However, the phrase "held to be a paying well under paragraph two hereof" must be further construed since paragraph two does not 'contain the words "paying well". Paragraph two, the habendum clause, provides, inter alia, that the lease shall continue as long as "oil or gas is found in paying quantities thereon". Paragraph two does not require that the production actually be marketed, but only that oil or gas are "found" on the leasehold. Therefore, both paragraph two and three contemplated continuation of the term of the lease where there is in fact a well capable of production which is not being produced for legitimate reasons.

Most of the cases construing terms such a "producing well" do so in relation to the habendum clause, that is whether the lease continues in effect because of a "producing well". Such cases as construe free gas provisions have in general construed them liberally in favor of the landowner. For example, in Boal v. Citizens Natural Gas Co., 23 Pa. Super. 339 (1903), a free gas provision was construed to require the furnishing of free gas even though the well on the particular leased estate had been depleted and was no longer in operation because the free gas provision did not specifically say that it was to be satisfied only out of production from the premises. We assume, although it was not clear from the decision, that the defendant in that case was a utility company or otherwise capable or performing the covenant for free gas from some other source of supply.

The closest thing to an analagous factual situation that we have found is Pittsburgh & West Virginia Gas Co. v. Nicholson, 87 W. Va. 540, 105 S.E. 784, 12 A.L.R. 1392 (1921). There defendant had been receiving free gas for some period of time from a well located on his premises. As the well became depleted, it became necessary to artificially pump the gas from it by creating a vacuum in the line and doing so prevented gas from flowing into the landowner's line because the gas had to work against atmospheric pressure. The operator took the position that because of the way the well had to be operated it was impossible to perform the covenant to permit the use of free gas. The court held that simply because the furnishing of free gas had become onerous was no grounds for rescinding the provision for free gas and that the delivery of free gas could not be interrupted by the manner of operating the well.·

Looking at the instant lease in the manner it was viewed by the parties at the time of its execution, we·believe that the intent was that as soon as gas was available in a well drilled on the premises the lessor was entitled to commence taking his reserved gas for domestic use. We, therefore, believe that initially the landowner was entitled to free gas as soon as the well was completed, that is, equipped with the necessary valves and fittings through which the landowner could tap the gas. In the absence of evidence to the contrary, this would be January 22, 1981.

This construction is, however, subject to further condition. We hold that it is an implied condition of paragraph 6 that the lessor can take gas only in a manner that is safe to himself, the operator and the general public. This requires the installation of such appliances, for example, a separator, a pressure reg-

ulator, etc., as will make the removal of gas to the lessor's dwelling safe. If the operator installs a separator, the lessor can comply with such safety requirement by connecting downstream of the separator. If the operator has no market for the gas and, therefore, does not see fit to install a separator at the time the well is originally completed, then the lessor in order to take gas safely would have to install his own separator. The free gas provision requires that the lessor furnish "his own appliances" to properly connect to the gas supply. There is nothing that requires the lessee to install any particular equipment to make the gas safely available to the lessor. On the other hand, if such equipment is installed by the operator, the lessor has the right to connect in such a manner as to utilize that safety equipment without the expense of purchasing his own.

We have used the separator only as illustration and do not intend that to be the only safety appliance required. Whatever is required in the nature of regulators or other equipment to make the gas safe for the lessor's use falls in the same category. If that equipment is installed by the lessee, the lessor has the right to utilize it. If it is not installed by the lessee, then the lessor has no right to free gas unless and until he installs such equipment at his own expense.

In the instant case, at the time of the hearing on preliminary injunction, it was established that certain requirements for the safe utilization of gas had not been installed by the landowners. Clearly such safety devices were installed at least by March 16, 1982 when the well was connected to the gathering line. Therefore, in this case, the date on which the landowner was entitled to free gas and should have been reconnected under the terms of the preliminary injunction by the plaintiff is March 16, 1982

unless there is conclusive evidence that at some earlier date defendants were willing to reconnect their gas line with the appropriate safety features and were forbidden the right to do so by plaintiff.

It would be difficult to imagine that the intent of the parties was that the lessor's supply of gas would be intermittantly turned on and off at the whim of the ultimate purchaser of the gas produced and sold. Such a construction would be totally unreasonable. Therefore, the mere fact that the well is shut in from time to time because of market conditions does not change its status as a producing well. A farmer's field which produces crops is no less productive acreage simply because over the winter no crop is being produced. A manufacturing plant does not cease to be a manufacturing plant simply because it may shut down during a vacation period or for that matter, over night. A producing gas well continues as a producing gas well as long as it is properly connected and capable of producing gas whether or not gas is actually flowing out of the well to the purchaser.

Although we read into the provisions of the gas lease an implied requirement that gas must be taken by the landowner in a reasonably safe manner, this does not mean that the landowner must sign the document dated April 5, 1982, a copy of which is attached to the stipulation. This document attempts to completely rewrite the contract between the parties and the plaintiff has no right to insist upon its execution. Plaintiff may make reasonable rules and regulations for the removal of gas by a landowner based solely on safety factors, but cannot, for example, require indemnification clauses other than those contained in the lease or in any other way attempt to impose collateral burdens on the landowner's right to take free gas.

Having decided that the plaintiff had an obligation to reconnect the defendants' lines at least by March 16, 1982, or within a reasonable period thereafter, we believe that in the procedural context we find ourselves in, our order should make absolute the rule to show cause why an attachment for contempt should not issue and a further contempt hearing should be held. See procedure outlined in Commonwealth ex. rel. Magaziner v. Magaziner, 434 Pa. 1, 253 A.2d 263 (1969). We, therefore, enter the following

## ORDER

And now, February 23, 1983, the rule to show cause why an attachment for contempt should not issue is made absolute and an attachment issued to plaintiff. A further hearing concerning the contempt and any remaining issues as yet undecided in this case will be scheduled upon motion of any party in interest. This order relates only to the defendants Stagl, but will be made applicable to defendant Rogers when and if facts appear of record either by stipulation or otherwise to indicate that the factual situation as to defendant Rogers is sufficiently similar as to come within the parameter of this opinion.