J-A13039-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ALPHA UPSILON OF THE FRATERNITY OF BETA THETA PI, INC. | : | No. 751 MDA 2022 |
| | : | |
| Appellant | : | |

Appeal from the Judgment Entered April 19, 2022
In the Court of Common Pleas of Centre County Civil Division at No(s):
18-4608

BEFORE: BOWES, J., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED OCTOBER 18, 2023**

Appellant, Alpha Upsilon of the Fraternity of Beta Theta Pi, Inc., appeals from the April 19, 2022 judgment entered in favor of Appellee, The Pennsylvania State University (hereinafter "the University" or "Appellee"), in this action for specific performance, following the March 23, 2022 denial of Appellant's motion for post-trial relief. After careful review, we affirm.

The trial court set forth the extensive findings of fact of this case as follows:

> Prior to 1888, fraternities were prohibited at the University due to the belief that such societies promoted an unwelcomed atmosphere of corruption and mischief.

---

[*] Former Justice specially assigned to the Superior Court.

The prohibition against fraternities was lifted by the University's Board of Trustees in January of 1888, upon the recommendation of University President George Atherton (hereinafter "President Atherton").

President Atherton's recommendation was in response to the University's need to provide additional housing options for its rapidly expanding undergraduate student population.

During this period of time, fraternity houses at institutions such as Harvard, Yale, and Princeton provided undergraduate students with a place to eat and sleep during their undergraduate studies.

Absent fraternity houses, the only on campus housing available to the University's undergraduate students at that time was on the fourth and fifth floors of the original Old Main building.

On September 1, 1894, the University deeded a parcel of land to [Appellant] "for the express purpose of erecting thereon a Fraternity or Chapter House for the use of the members of the Alpha Upsilon Chapter of the Fraternity of Beta Theta Pi at the Pennsylvania State College."

The Deed of 1894 further provided as follows:

AND WHEREAS the lot of ground herein described is conveyed to the party of the second part for the express purpose of erecting thereon a fraternity or chapter house for the use of the members of the Alpha Upsilon Chapter of the Fraternity of Beta Theta Pi at the Pennsylvania State College;

AND WHEREAS a building for the purposes herein referred to is now being erected upon the said land, it is distinctly understood and agreed that the said building and the premises conveyed are to be used solely and exclusively for the uses and purposes of the said fraternity and of the members thereof now and all times hereafter and

if for any reason, the said premises should cease to be used as a chapter or fraternity house. …, then and in that event the [University] reserves the right to purchase the said premises….

. . . .

In 1919, H. Walton Mitchell (hereinafter "Mitchell"), a founding member of Beta Theta Pi and chair of the University's Board of Trustees, asked J. Franklin Shields (hereinafter "Shields") to propose a series of rules and regulations which would govern the transfer of land to fraternities.

Shields was the first undergraduate member admitted into the Active Chapter of Beta Theta Pi at the University after the original nine (9) founding members, and later became a member of the University's Board of Trustees.

The aforementioned rules and regulations written by Shields were adopted by the Board in 1921. On such rule was a requirement that the land transferred be owned and maintained by an alumni corporation "for the active chapter."

The bylaws of [Appellant] state: "The Alumni Corporation of the Alpha Upsilon Chapter of the Be[]ta Theta Pi fraternity was established to maintain an exceptional facility and environment which serves as a home to active Chapter members and as a welcome place to visit for alumni members.

Shields[] stated that these fraternity houses were a great convenience in taking care of so many students" and the University had "the right to make these deeds for fraternity houses on campus because of the incident benefit to the College and its purposes."

On October 29, 1928, approximately seven (7) years after the adoption of Shields' proposed rules and regulations by the University's Board of Trustees, the parcel of land previously transferred to [Appellant] in 1894 was re-conveyed back to the University.

In connection with said re-conveyance, the University paid [Appellant] $27,500.

That same day, the University conveyed a different parcel of land to the House Corp, located at 220 North Burrowes Road, State College, Pennsylvania (hereinafter the "Property" or the "Beta House"). The 1928 Deed again stated the conveyance was "made for the express purpose of the erection and perpetual maintenance by the said party of the second part hereto of a Fraternity or Chapter House for the use of the members of the said Chapter of the said Fraternity…."

The 1928 Deed from the University to [Appellant] provides in part, as follows:

> **It is hereby expressly stipulated that this conveyance is made for the express purpose of the erection and perpetual maintenance by the said party of the second part hereto of a Fraternity or Chapter House for the use of the members of the said Chapter of the said Fraternity**, and that the erection and maintenance thereof is a condition of this conveyance, and that this conveyance is also made subject to the exceptions and reservations next hereinafter set forth.
>
> EXCEPTING AND RESERVING to the party of the first part hereto, its successors and assigns, as conditions of the estate and title hereby granted, the following rights and privileges, viz:
>
> FIRST.- The right at all times to require that at least seventy five percent of all members of [Appellant] be over twenty one years of age and shall be non-active members of the said local chapter of the said Fraternity, and that all officers of the said corporation shall be over twenty one years of age and shall be non- active members of the said local chapter of the said Fraternity, which said condition and requirement the said party of

the second part hereto hereby agrees to maintain as a permanent requirement of its constitution and By-Laws.

\*\*\*

THIRD.- The right to purchase the said lot and the building or buildings to be erected thereon, as follows, to wit: **If for any reason the said building or buildings should cease to be used as a Chapter or Fraternity House, for the use, benefit and behoof of the said party of the second part hereto, or if the said party of the second part should fail to meet and comply with the other conditions and stipulations herein set forth, then in any such case and thereupon the said party of the first part, for itself and its successors and assigns, reserves the right to purchase the said lot and the building or buildings to be erected thereon** at any time within five years from and after the date hereof at two-thirds of the actual cost of the building or buildings to be erected upon the said lot, and after the said period of five years the right to purchase the same at a price which may be agreed upon by the party of the first part and the party of the second part hereto, their successors and assigns, respectively; **Provided, nevertheless, that in case the said parties cannot agree upon a price for the same, the said purchase price shall be fixed and determined by arbitrators mutually agreed upon by the parties hereto, their successors and assigns;...**

Thereafter, [Appellant] built the Beta House for use by the Alpha Upsilon Chapter of Beta Theta Pi at the University (hereinafter the "Active Chapter").

The primary use of the Beta House has been to provide a residence for members of the Active Chapter at the University.

- 5 -

On February 2, 2017, the Active Chapter gathered at the Beta House to initiate the spring 2017 pledge class into the Active Chapter.

As a result of various alcohol-related hazing activities occurring that evening, Associate Member (hereinafter "Pledge") of the Active Chapter, Timothy Piazza (hereinafter "Piazza"), sustained injuries that resulted in his death on February 4, 2017.

On February 5, 2017, the General Fraternity of Beta Theta Pi (hereinafter the "National Fraternity" or "Nationals") required the Active Chapter to cease operations pending an investigation into the events surrounding Piazza's death.

During the following 10-day period, Jeff Rundle (hereinafter "Rundle"), Executive Director of the National Fraternity, led an investigation into said events.

Based on the aforementioned investigation, the National Fraternity determined the Active Chapter had violated the National's risk management policy.

On February 15, 2017, the General Secretary of the National Fraternity's Board of Trustees determined that the Charter of the Alpha Upsilon Chapter of Beta Theta Pi at the University should be suspended and the Active Chapter disbanded.

Under the Code of Beta Theta Pi:

    a. (3) *Definition of a Disbanded Chapter*: A disbanded chapter is one ( 1) the charter of which has been suspended and (2) the members of which have been ordered to disband…. A disbanded chapter may not continue to operate as a chapter of Beta Theta Pi for any purpose and is not to be counted as a chapter of the fraternity.

The National Fraternity's decision was made based on its own independent judgment that disciplinary action was necessary against the Active Chapter.

The decision related to housing and whether those Active Chapter tenants would be entitled to continue to live in the Beta House rested with [Appellant].

On February 21, 2017, [Appellant's] Board unanimously voted to require the Active Chapter tenants vacate the Property on or before March 4, 2017.

The Charter of the Alpha Upsilon Chapter of Beta Theta Pi remains indefinitely suspended up through and including the present time. The Active Chapter also remains disbanded.

The decision to suspend and disband the Active Chapter does not foreclose the opportunity for the future reestablishment of the Chapter at the University.

In order to lift the suspension of the Charter, the "Code" stipulates that the staff, at the direction of the Board of Trustees of the National Fraternity, would conduct an investigation into the fitness of the campus and readiness of the alumni base to support the return and reestablishment of a Chapter on campus. The Fraternity staff would then recruit new members and after approximately three (3) years of operation under a suspended Charter or recolonization, the General Convention would consider an application to extend the Charter back to the group or reestablish a new group.

The suspension and disbandment of the Active Chapter was the most severe form of punishment the Board of Trustees of the National Fraternity could take on behalf of the National Fraternity.

During the summer of 2017, the Board of Trustees of the National Fraternity recommended to the General

Convention of Beta Theta Pi that the Charter of the Alpha Upsilon Chapter of Beta Theta Pi be revoked.

The vote was 76 to 30 in favor of revoking the Charter of the Alpha Upsilon Chapter of Beta Theta Pi. However, due to a rule requiring a super majority, the vote failed by four (4) votes.

The University also conducted an investigation into the events surrounding Piazza's death. The University's investigation included a review of relevant portions of the video evidence from the Beta House on February 2, and 3, 2017, meetings with representatives from the National Fraternity and [Appellant], meetings with representatives of State College Borough, meetings with law enforcement, and interviews with approximately forty (40) student witnesses.

On or about February 17, 2017, the University issued a statement announcing its decision to revoke the recognition of the Active Chapter of Beta Theta Pi as a recognized student organization for a period of five (5) years. A final decision as to the length of the revocation was to be made upon completion of the University's internal investigation.

The aforementioned investigation confirmed numerous alcohol-related hazing violations that took place in connection with pledge activities at the Beta House and confirmed such activities had been ongoing at the Beta House since at least 2014.

Since the members of the Active Chapter were evicted from the Beta House by [Appellant] in March 2017, the Beta House has not been used as a home for Active Chapter members.

On March 30, 2017, the University permanently revoked recognition of the Active Chapter as a recognized student organization.

Since March 2017, the Beta House has been used occasionally by a few members of [Appellant],

typically football weekends in the fall or during the weekend of the University's annual Blue-White football scrimmage in the spring.

[Appellant] has no plans to use the Beta House in the future as anything other than as a place for their "alumni fraternity."

Additionally, the events surrounding Piazza's death, as well as previous instances of illegal actions by Active Chapter members, led to the filing of criminal charges against numerous Active Chapter members.

Prior to January 7, 2019, the bylaws of [Appellant], provided in Article III, Section 1, entitled Members and Voting Rights: "All persons who have been initiated or who shall be initiated as full members of the Alpha Upsilon Chapter of Beta Theta Pi shall be members of the Corporation provided they are no longer Active Chapter members. Each member of the Corporation shall have one vote."

The bylaws were amended to provide that only dues-paying alumni are eligible to be members of [Appellant] and those who do not pay the annual dues have no [Appellant] membership nor any privileges that go with it.

Out of approximately 825 Alumni members, 325 have paid the annual dues.

Membership in the House Corporation has been closed and no new members will be admitted.

In late 2017 or early 2018, representatives of [Appellant] approached the University to determine whether the University would be interested in purchasing the Beta House.

The University toured the Beta House and secured an appraisal of the property.

On March 29, 2018, counsel for [Appellant] wrote to the University's Senior Vice President for Finance &

Business/Treasurer and again expressed [Appellant's] interest in selling the Beta House to the University.

On April 26, 2018, the University, through its counsel, expressed its interest in purchasing the Beta House but indicated a preference to include Don Abbey (hereinafter "Abbey") in any such discussions at that time.

On June 30, 2018, the Board of Directors of [Appellant] met and voted to recommend to the membership a sale of the premises, not to the University, but to Abbey individually.

A special meeting to consider the Board's recommendation was set for July 20, 2018; however, a quorum was not present.

On August 10, 2018, a second special meeting of the membership of [Appellant] was held, at which time the proposal to sell the property to Abbey failed a membership vote.

While the proposal to sell the property to Abbey was pending, the University separately offered to purchase the property from Abbey if [Appellant] membership approved a sale to him.

After the proposed sale to Abbey was rejected [Appellant] became unwilling to consider a sale of the Beta House to the University.

The University then gave notice of its intent, pursuant to the 1928 Deed, to purchase the property.

Trial court opinion and verdict, 12/21/21 at 2-12 (citations and numeration omitted; emphasis in original).

The relevant procedural history of this case, as gleaned from the certified record, is as follows: On November 19, 2018, the University filed a complaint against Appellant for specific performance of the provision in the

1928 Deed granting the University the right to repurchase the property. On January 15, 2019, Appellant filed preliminary objections to the University's complaint. The trial court held oral argument on this matter on February 25, 2019. Thereafter, on March 22, 2019, the trial court overruled Appellant's preliminary objections. *See* trial court opinion and order, 3/22/19 at 2-6.

Following a COVID-related continuance, Appellant filed a motion for summary judgment and a brief in support of said motion on June 1, 2021. The trial court denied Appellant's motion for summary judgment on August 20, 2021. On September 14, 2021, Appellant filed a motion in *limine* seeking to preclude parol evidence. The trial court held oral argument on this matter on October 4, 2021, at the conclusion of which it filed an opinion and order denying said motion. *See* trial court opinion and order, 10/11/21 at 2-4.

The trial court held a non-jury trial from October 18 to October 20, 2021. Thereafter, on December 21, 2021, the trial court entered a verdict in favor of the University and ordered that "ownership of the subject premises shall be transferred back to [the University]." Trial court opinion and verdict, 12/21/21 at 19. The trial court further ordered that once the verdict became final, the parties would have the opportunity to appraise "the fair market value of the property" and negotiate a transfer price, and if the parties could not agree on one, the price would be set by arbitrators selected by the parties. *Id.*

On January 3, 2022, Appellant filed a motion for post-trial relief, which was denied by the trial court on March 23, 2022. Thereafter, on April 19, 2022, the Centre County Prothonotary entered judgment on the verdict in favor of the University. This timely appeal followed on April 21, 2022.

On April 29, 2022, the trial court ordered Appellant to file a concise statement of errors complained of on appeal, in accordance with Pa.R.A.P. 1925(b), within 21 days. Following an extension, Appellant filed a timely Rule 1925(b) statement on September 6, 2022. On September 7, 2022, the trial court filed a one-page Rule 1925(a) opinion indicating that it was relying on its reasoning set forth in its prior December 21, 2021 opinion.

Appellant raises the following issues for our review:

1. Whether the deed provision in question create an option to purchase the Property or a fee simple subject to a condition subsequent?

2. If the deed provision created an option to purchase, is it subject to and violative of the Rule against Perpetuities; and also unenforceable for failure to fix a mechanism for determining fair market value?

3. Whether extrinsic evidence was properly considered in construing deed?

4. Whether [Appellant] ever ceased using the Property as a Chapter or Fraternity House?

Appellant's brief at 4.

Our scope and standard of review of a non-jury verdict is well settled:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the

- 12 -

trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

*Bank of New York Mellon v. Bach*, 159 A.3d 16, 19 (Pa.Super. 2017) (citation omitted), *appeal denied*, 170 A.3d 1019 (Pa. 2017).

Instantly, the crux of Appellant's argument on appeal concerns whether the trial court misinterpreted the language of the 1928 deed by failing to define the nature of the interest conveyed as an option to repurchase the property, rather than a fee simple subject to a condition subsequent. Appellant's brief at 16-25. Appellant avers that this deed option should have been found void and unenforceable under the Rule against Perpetuities. *Id.* at 26-29. Appellant further contends that the trial court improperly considered extrinsic evidence in concluding, *inter alia*, that a "fraternity" requires undergraduate residents; Appellant maintains that this decision "[wa]s not only unsupported by, but actually contradicts, the language of the deed." *Id.* at 15, 31-39.

In situations involving the interpretation of a deed, this Court has recognized the following:

> [A] court's primary object must be to ascertain and effectuate what the parties themselves intended. The traditional rules of construction to determine that intention involve the following principles. First, the nature and quantity of the interest conveyed must be ascertained from the deed itself and cannot be orally shown in the absence of fraud, accident or mistake. We seek to ascertain not what the parties may have intended by the language but what is the meaning of the words they used. Effect must be given to all the language of the instrument, and no part shall be rejected if it can be given a meaning. If a doubt arises concerning the interpretation of the instrument, it will be resolved against the party who prepared it…. To ascertain the intention of the parties, the language of a deed should be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed….
>
> In the absence of fraud, accident or mistake, the nature and quantity of the real estate interest conveyed must be ascertained from the deed itself and cannot be shown by parol. When the language of the deed is clear and free from ambiguity, the intent of the parties must be determined from the language of the deed. With respect to unambiguous deeds, a court must ascertain what is the meaning of the words used, not what may have been intended by the parties as shown by parol.

**Wright v. Misty Mt. Farm, LLC**, 125 A.3d 814, 818-819 (Pa.Super. 2015) (citations omitted), **appeal denied**, 140 A.3d 14 (Pa. 2016).

Following a thorough review of the record, including the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, it is our determination that Appellant's claims on appeal warrant no relief. In

its comprehensive 18-page opinion, the trial court addressed each of Appellant's allegations of error and concluded that they are without merit. We find that the trial court's conclusions are supported by competent evidence and are clearly free of legal error.

Specifically, we agree with the trial court's determination that the applicable rules of construction support a finding that the parties intended the 1928 Deed to create a fee simple subject to a condition subsequent, which is not subject to the Rule against Perpetuities. *See* trial court opinion and verdict, 12/21/21 at 14-16. We also discern no error on the part of the trial court in concluding that the University's right to purchase the property was triggered on account of the fact that the property was no longer functioning as a "fraternity house." *Id.* at 17. The trial court stated as follows:

> [T]he Court concludes the plain language of the 1928 Deed, when read in its entirety, contemplates that the conveyance to [Appellant] by the University was for the express purpose of the construction and maintenance of a Chapter or Fraternity House for use by Active Chapter Members of Beta Theta Pi. In order to determine whether [Appellant] is in breach of the 1928 Deed, thereby triggering the University's right to purchase, the Court looks to the current use of the Property. As discussed, the Charter of Beta Theta Pi at the University was suspended and the Active Chapter of Beta Theta Pi at the University was disbanded in response to the death of Piazza in February of 2017. On February 21, 2017, [Appellant's] Board held a unanimous vote to require the Active Chapter vacate the Property on or before March 4, 2017. Since that time, the Property has not been used as a home for Active Chapter members. Currently, the only individual residing in the Property is a son of a dues paying [Appellant] member. The

individual has no personal affiliation with Beta Theta Pi. In addition to this individual, dues paying members of [Appellant] intermittently use the Property for Board meetings, or as temporary accommodations — akin to hotel accommodations — during home football weekends and other special events. It is clear to this Court that such use does not constitute use as a Fraternity or Chapter House under the 1928 Deed. Accordingly, the Court finds the University's right to purchase the Property has been triggered.

Although it appears to this Court that [Appellant] desires something more happen with the Property, such as recolonization, such a desire is not enough to overcome the fact that the condition subsequent has occurred. [Appellant] is a non-profit organization. It is not a fraternity. It cannot control the reestablishment of the Active Chapter at the University nor can it institute recolonization of a new chapter at the University. Such a decision remains at the discretion of the General Fraternity and no evidence was presented to the Court indicating any intention on behalf of the General Fraternity to change or alter the status of the Alpha Upsilon Chapter at the University since the Active Chapter was vacated in March of 2017.

*Id.* at 17-18.

Upon our own independent review, we find that the record supports the trial court's findings. Accordingly, we adopt the analysis set forth in the comprehensive December 21, 2021 opinion of the Honorable Brian K. Marshall as our own for purposes of this appellate review. The trial court's April 19, 2022 judgment entered in favor of the University is thereby affirmed.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 10/18/2023

**IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY, PENNSYLVANIA**
**CIVIL ACTION – LAW**

| | | |
|---|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 2018-4608 |
| THE ALPHA UPSILON CHAPTER OF THE FRATERNITY OF BETA THETA PI, INC., | ) ) ) ) | |
| Defendants. | ) | |

*Attorney for Plaintiff:*                                    *James M. Horne, Esquire/*
                                                                         *Alexander R. Bilus, Esquire/*
                                                                         *Matthew J. Smith, Esquire*

*Attorney for Defendant:*                                 *Mark W. Bernlohr, Esquire/*
                                                                         *Michael P. Leahey, Esquire/*
                                                                         *Daniel Michelmore, Esquire*

**OPINION AND VERDICT**

**Marshall, J.**

On November 11, 2018, The Pennsylvania State University (hereinafter "Plaintiff" or the "University") commenced this action by filing a Complaint for Specific Performance (hereinafter the "Complaint") against The Alpha Upsilon Chapter of the Fraternity of Beta Theta Pi, Inc. (hereinafter "Defendants" or the "House Corp."). In response to the Complaint, the House Corp. filed Preliminary Objections on January 15, 2019 in the Nature of a Demurrer and a Motion to Strike Scandalous/Impertinent Matter which were overruled by this Court on March 22, 2019. On July 9, 2019, the House Corp. filed an Answer and New Matter to the University's Complaint. The University filed an Answer to the House Corp.'s New Matter on July 26, 2019. On June 16, 2020, the University and the House Corp. filed a Motion to Continue Trial Date and Establish New Case

☒O ☐RD ☐S

Management Deadlines due to the effects of the Coronavirus pandemic which Motion was granted by this Court on June 19, 2020.

On June 1, 2021, the House Corp. filed a Motion for Summary Judgment which was denied by this Court on August 20, 2021. On September 14, 2021, the House Corp. filed a Motion *in Limine.* Said Motion was denied by this Court on October 11, 2021. On September 22, 2021, the House Corp. filed a Motion for a Bench View which was subsequently granted by the Court on October 6, 2021 for the limited purpose of pointing out relevant physical features of the premises to assist the Court in understanding the testimony and evidence to be presented at trial. Said bench view occurred on October 18, 2021 immediately prior to the commencement of the trial. The Court held a Non-Jury Trial in this matter from October 18, 2021 until October 20, 2021. Both parties submitted Proposed Findings of Facts and Conclusions of Law on November 22, 2021. After review of the filings, the arguments of the parties, and the applicable law, the Court is prepared to render a verdict in this matter.

## FINDINGS OF FACT

1. Prior to 1888, fraternities were prohibited at the University due to the belief that such societies promoted an unwelcomed atmosphere of corruption and mischief. [PSU 4-0003; PSU 54; Esposito, Vol. 2, N.T. 76-86; 99-100].

2. The prohibition against fraternities was lifted by the University's Board of Trustees in January of 1888, upon the recommendation of University President George Atherton (hereinafter "President Atherton"). [PSU 4-0003; PSU 54; Esposito, Vol. 2, N.T. 76-86; 98-101].

3. President Atherton's recommendation was in response to the University's need to provide additional housing options for its rapidly expanding undergraduate student population. [*Id.*].

2

4. During this period of time, fraternity houses at institutions such as Harvard, Yale, and Princeton provided undergraduate students with a place to eat and sleep during their undergraduate studies. [Esposito, Vol. 2, N.T. 82-84].

5. Absent fraternity houses, the only on campus housing available to the University's undergraduate students at that time was on the fourth and fifth floors of the original Old Main building. [PSU 4-0003; PSU 54; Esposito, Vol. 2, N.T. 78-79].

6. On September 1, 1894, the University deeded a parcel of land to the House Corp. "for the express purpose of erecting thereon a Fraternity or Chapter House for the use of the members of the Alpha Upsilon Chapter of the Fraternity of Beta Theta Pi at the Pennsylvania State College." [PSU 7; See also PSU 5, 0015-0019].

7. The Deed of 1894 further provided as follows:

> AND WHEREAS the lot of ground herein described is conveyed to the party of the second part for the express purpose of erecting thereon a fraternity or chapter house for the use of the members of the Alpha Upsilon Chapter of the Fraternity of Beta Theta Pi at the Pennsylvania State College:

> AND WHEREAS a building for the purposes herein referred to is now being erected upon the said land, it is distinctly understood and agreed that the said building and the premises conveyed are to be used solely and exclusively for the uses and purposes of the said fraternity and of the members thereof now and all times hereafter and if for any reason, the said premises should cease to be used as a chapter or fraternity house...., then and in that event the [University] reserves the right to purchase the said premises....

[PSU 7, 0003; PSU 5, 0017].

8. In addition to the parcel deeded to the House Corp., the University also deeded five (5) other parcels of land to local chapters of other national fraternities for the express purpose of constructing fraternity houses. [PSU 10-15; PSU 4-0004, 0011-0014; Esposito, Vol. 2, N.T. 81, 93-98].

9. These five (5) other conveyances were as follows:

    a. The University to Phi Delta Theta, 1905;

    b. The University to Alpha Chi, 1905;

    c. The University to Phi Gamma Delta, 1915;

    d. The University to Alpha Zeta, 1915; and

    e. The University to Sigma Nu, 1925.

    [*Id.*].

10. In 1919, H. Walton Mitchell (hereinafter "Mitchell"), a founding member of Beta Theta Pi and chair of the University's Board of Trustees, asked J. Franklin Shields (hereinafter "Shields") to propose a series of rules and regulations which would govern the transfer of land to fraternities. [PSU 5, 0126-1340; Esposito, Vol. 2, N.T. 74-84].

11. Shields was the first undergraduate member admitted into the Active Chapter of Beta Theta Pi at the University after the original nine (9) founding members, and later became a member of the University's Board of Trustees. [*Id.*]

12. The aforementioned rules and regulations written by Shields were adopted by the Board in 1921. One such rule was a requirement that the land transferred be owned and maintained by an alumni corporation "for the active chapter." [PSU 5, 0051; Esposito, Vol. 2, N.T. 80].

13. The bylaws of the House Corp. state: "The Alumni Corporation of the Alpha Upsilon Chapter of the Berta Theta Pi fraternity was established to maintain an exceptional facility and environment which serves as a home to active Chapter members and as a welcome place to visit for alumni members." [Cassidy Vol. 2, N.T. 140-141; Def. HHH].

14. Shields' stated that these fraternity houses were "a great convenience in taking care of so many students" and the University had "the right to make these deeds for fraternity houses on campus

4

because of the incident benefit to the College and its purposes." [PSU 5, 0126-1340; Esposito, Vol. 2, N.T. 74-84].

15. On October 29, 1928, approximately seven (7) years after the adoption of Shields' proposed rules and regulations by the University's Board of Trustees, the parcel of land previously transferred to the House Corp. in 1894 was re-conveyed back to the University. [PSU 8].

16. In connection with said re-conveyance, the University paid the House Corp. $27, 500. [PSU 5, 0120-123; Esposito, Vol. 2, N.T. 89-90].

17. That same day, the University conveyed a different parcel of land to the House Corp. located at 220 North Burrowes Road, State College, Pennsylvania (hereinafter the "Property" or the "Beta House"). The 1928 Deed again stated the conveyance was "made for the express purpose of the erection and perpetual maintenance by the said party of the second part hereto of a Fraternity or Chapter House for the use of the members of the said Chapter of the said Fraternity...." [PSU 9, 0002].

18. The 1928 Deed from the University to the House Corp. provides in part, as follows:

> **It is hereby expressly stipulated that this conveyance is made for the express purpose of the erection and perpetual maintenance by the said party of the second part hereto of a Fraternity or Chapter House for the use of the members of the said Chapter of the said Fraternity,** and that the erection and maintenance thereof is a condition of this conveyance, and that this conveyance is also made subject to the exceptions and reservations next hereinafter set forth.
>
> EXCEPTING AND RESERVING to the party of the first part hereto, its successors and assigns, as conditions of the estate and title hereby granted, the following rights and privileges, viz:
>
> FIRST.- The right at all times to require that at least seventy five percent of all members of the [House Corp.] be over twenty one years of age and shall be non-active members of the said local chapter of the said Fraternity, and that all officers of the said corporation shall be over twenty one years of age and shall be non-active members of the said local chapter of the said Fraternity, which said condition and requirement the said party of the

second part hereto hereby agrees to maintain as a permanent requirement of its constitution and By-Laws.

\* \* \*

THIRD.- The right to purchase the said lot and the building or buildings to be erected thereon, as follows, to wit: **If for any reason the said building or buildings should cease to be used as a Chapter or Fraternity House, for the use, benefit and behoof of the said party of the second part hereto, or if the said party of the second part should fail to meet and comply with the other conditions and stipulations herein set forth, then in any such case and thereupon the said party of the first part, for itself and its successors and assigns, reserves the right to purchase the said lot and the building or buildings to be erected thereon** at any time within five years from and after the date hereof at two-thirds of the actual cost of the building or buildings to be erected upon the said lot, and after the said period of five years the right to purchase the same at a price which may be agreed upon by the party of the first part and the party of the second part hereto, their successors and assigns, respectively; **Provided, nevertheless, that in case the said parties cannot agree upon a price for the same, the said purchase price shall be fixed and determined by arbitrators mutually agreed upon by the parties hereto, their successors and assigns;...**

[PSU 9, 0002-0003](emphasis added).

19. Thereafter, the House Corp. built the Beta House for use by the Alpha Upsilon Chapter of Beta Theta Pi at the University (hereinafter the "Active Chapter").

20. The primary use of the Beta House has been to provide a residence for members of the Active Chapter at the University. [Cassidy, Vol. 2, N.T. 141-142].

21. On February 2, 2017, the Active Chapter gathered at the Beta House to initiate the spring 2017 pledge class into the Active Chapter. [PSU 29, 30].

22. As a result of various alcohol-related hazing activities occurring that evening, Associate Member (hereinafter "Pledge") of the Active Chapter, Timothy Piazza (hereinafter "Piazza"), sustained injuries that resulted in his death on February 4, 2017. [*Id.*].

23. On February 5, 2017, the General Fraternity of Beta Theta Pi (hereinafter the "National Fraternity" or "Nationals") required the Active Chapter to cease operations pending an

6

investigation into the events surrounding Piazza's death. [PSU 2, Rundle Depo., N.T. 58, 70-71; PSU 2.1, PSU 47; Cassidy Vol. 2, N.T. 122-123].

24. During the following 10-day period, Jeff Rundle (hereinafter "Rundle"), Executive Director of the National Fraternity, led an investigation into said events. [PSU 2, Rundle Depo., N.T. 49-60].

25. Based on the aforementioned investigation, the National Fraternity determined the Active Chapter had violated the National's risk management policy. [PSU 2, Rundle Dep., N.T. 57-58, 80; PSU 2.5-2.9, 2.13-2.14].

26. On February 15, 2017, the General Secretary of the National Fraternity's Board of Trustees determined that the Charter of the Alpha Upsilon Chapter of Beta Theta Pi at the University should be suspended and the Active Chapter disbanded. [PSU 2.2, 2.3-2.9; PSU 2, Rundle Depo., N.T. 59-60].

27. Under the Code of Beta Theta Pi:

   a. (3) *Definition of a Disbanded Chapter:* A disbanded chapter is one (1) the charter of which has been suspended and (2) the members of which have been ordered to disband.... A disbanded chapter may not continue to operate as a chapter of Beta Theta Pi for any purpose and is not to be counted as a chapter of the fraternity.

[PSU 2.2, 0007, 0009; PSU 2.7].

28. The National Fraternity's decision was made based on its own independent judgment that disciplinary action was necessary against the Active Chapter. [PSU 2.2., 00006; PSU 2.8].

29. The decision related to housing and whether those Active Chapter tenants would be entitled to continue to live in the Beta House rested with the House Corp. [PSU 2, Rundle Dep., N.T. 28].

30. On February 21, 2017, the House Corp.'s Board unanimously voted to require the Active Chapter tenants vacate the Property on or before March 4, 2017. [Shaha, Vol. 3, N.T. 133-135].

31. The Charter of the Alpha Upsilon Chapter of Beta Theta Pi remains indefinitely suspended up through and including the present time. The Active Chapter also remains disbanded. [PSU 2, Rundle Depo., N.T. 36].

32. The decision to suspend and disband the Active Chapter does not foreclose the opportunity for the future reestablishment of the Chapter at the University. [PSU 2, Rundle Dep., N.T. 30].

33. In order to lift the suspension of the Charter, the "Code" stipulates that the staff, at the direction of the Board of Trustees of the National Fraternity, would conduct an investigation into the fitness of the campus and readiness of the alumni base to support the return and reestablishment of a Chapter on campus. The Fraternity staff would then recruit new members and after approximately three (3) years of operation under a suspended Charter or recolonization, the General Convention would consider an application to extend the Charter back to the group or reestablish a new group. [PSU 2, Rundle Dep., N.T. 37].

34. The suspension and disbandment of the Active Chapter was the most severe form of punishment the Board of Trustees of the National Fraternity could take on behalf of the National Fraternity. [PSU 2, Rundle Depo., N.T. 60].

35. During the summer of 2017, the Board of Trustees of the National Fraternity recommended to the General Convention of Beta Theta Pi that the Charter of the Alpha Upsilon Chapter of Beta Theta Pi be revoked. [PSU 2, Rundle Depo., N.T. 60-63; PSU 2-14].

8

36. The vote was 76 to 30 in favor of revoking the Charter of the Alpha Upsilon Chapter of Beta Theta Pi. However, due to a rule requiring a super majority, the vote failed by four (4) votes. [*Id.*].

37. The University also conducted an investigation into the events surrounding Piazza's death. [*See*, testimony of D. Sims, S. Peters, D. Shaha at Vol. 1, N.T. 41-146; PSU 27, 29, 30].

38. The University's investigation included a review of relevant portions of the video evidence from the Beta House on February 2, and 3, 2017, meetings with representatives from the National Fraternity and the House Corp., meetings with representatives of State College Borough, meetings with law enforcement, and interviews with approximately forty (40) student witnesses. [See, testimony of D. Sims, S. Peters, D. Shaha at Vol. 1, N.T. 41-146; PSU 27, 29, 30].

39. On or about February 17, 2017, the University issued a statement announcing its decision to revoke the recognition of the Active Chapter of Beta Theta Pi as a recognized student organization or a period of five (5) years. A final decision as to the length of the revocation was to be made upon completion of the University's internal investigation. [PSU 28, Sims, Vol. 1, N.T. 67-68].

40. The aforementioned investigation confirmed numerous alcohol-related hazing violations that took place in connection with pledge activities at the Beta House and confirmed such activities had been ongoing at the Beta House since at least 2014. [PSU 29, 30].

41. Since the members of the Active Chapter were evicted from the Beta House by the House Corp. in March 2017, the Beta House has not been used as a home for Active Chapter members. [Cassidy, Vol. 2, N.T. 141; Def.'s Resp. to Pl.'s Req. for Admis. No. 8].

42. On March 30, 2017, the University permanently revoked recognition of the Active Chapter as a recognized student organization. [Sims, Vol. N.T. 46-47].

43. Since March 2017, the Beta House has been used occasionally by a few members of the House Corp., typically football weekends in the fall or during the weekend of the University's annual Blue-White football scrimmage in the spring. [PSU 40; Cassidy, Vol. 2, N.T. 132-140].

44. The House Corp. has no plans to use the Beta House in the future as anything other than as a place for their "alumni fraternity." [Palmer, Vol. 2, N.T. 183-184].

45. Additionally, the events surrounding Piazza's death, as well as previous instances of illegal actions by Active Chapter members, led to the filing of criminal charges against numerous Active Chapter members. [See e.g., Centre County Court of Common Pleas Criminal Docket Nos.: 17-1349, 17-1379, 17-1385, 17-1389, 17-1390, 17-913, 17-2086, 18-0818, 18-1151, 18-1535, 18-1535, 18-1540, 18-0783, 18-0784, 18-0884, 19-1391, 19-1418, 19-1558, 19-1560].

46. Prior to January 7, 2019, the bylaws of the House Corp. provided in Article III, Section 1, entitled Members and Voting Rights: "All persons who have been initiated or who shall be initiated as full members of the Alpha Upsilon Chapter of Beta Theta Pi shall be members of the Corporation provided they are no longer Active Chapter members. Each member of the Corporation shall have one vote." [Def. HHH].

47. The bylaws were amended to provide that only dues-paying alumni are eligible to be members of the House Corp. and those who do not pay the annual dues have no House Corp. membership nor any privileges that go with it. [PSU 19, 20].

48. Out of approximately 825 Alumni members, 325 have paid the annual dues. [PSU 20; Palmer, Vol. 2, N.T. 177-183; Aceto, Vol. 3, N.T. 115-116].

49. Membership in the House Corporation has been closed and no new members will be admitted. [*Id.*].

50. In late 2017 or early 2018, representatives of the House Corp. approached the University to determine whether the University would be interested in purchasing the Beta House. [PSU 32, Gray, Vol. 1, N.T. 150-154].

51. The University toured the Beta House and secured an appraisal of the property. [PSU 32, 33; Gray Vol. 1, N.T. 152-158].

52. On March 29, 2018, counsel for House Corp. wrote to the University's Senior Vice President for Finance & Business/Treasurer and again expressed the House Corp.'s interest in selling the Beta House to the University. [PSU 35, Gray, Vol. 1, N.T. 159-160].

53. On April 26, 2018, the University, through its counsel, expressed its interest in purchasing the Beta House but indicated a preference to include Don Abbey (hereinafter "Abbey") in any such discussions at that time. [PSU 36].

54. On June 30, 2018, the Board of Directors of the House Corp. met and voted to recommend to the membership a sale of the premises, not to the University, but to Abbey individually. [PSU 37; Cassidy, Vol. 2, N.T. 150].

55. A special meeting to consider the Board's recommendation was set for July 20, 2018; however, a quorum was not present. [PSU 38; Cassidy, Vol. 2, N.T. 153].

56. On August 10, 2018, a second special meeting of the membership of the House Corp. was held, at which time the proposal to sell the property to Abbey failed a membership vote. [PSU 38; Cassidy, Vol. 2, N.T. 153].

57. While the proposal to sell the property to Abbey was pending, the University separately offered to purchase the property from Abbey if the House Corp. membership approved a sale to him. [Gray, Vol. 1, N.T. 162-164; Barron, Vol. 2, N.T. 16-17].

58. After the proposed sale to Abbey was rejected, the House Corp. became unwilling to consider a sale of the Beta House to the University. [PSU 39; Gray, Vol. 1, N.T. 164].

59. The University then gave notice of its intent, pursuant to the 1928 Deed, to purchase the property. [*Id.*].

## CONCLUSIONS OF LAW

1. "The same principles that apply to the interpretation of a contract apply to the interpretation of a deed." *Starling v. Lake Meade Prop. Owners Ass'n, Inc.*, 640 Pa. 126, 148, 162 A.3d 327, 341 (Pa. 2017) (citing *New Charter Coal Co. v. McKee*, 411 Pa. 307, 191 A.2d 830, 834 (1963)).

2. When interpreting a deed:

> [A] court's primary object must be to ascertain and effectuate what the parties themselves intended. The traditional rules of construction to determine that intention involve the following principles. First, the nature and quantity of the interest conveyed must be ascertained from the deed itself and cannot be orally shown in the absence of fraud, accident or mistake. We seek to ascertain not what the parties may have intended by the language but what is the meaning of the words they used. Effect must be given to all the language of the instrument, and no part shall be rejected if it can be given a meaning. If a doubt arises concerning the interpretation of the instrument, it will be resolved against the party who prepared it. To ascertain the intention of the parties, the language of a deed should be interpreted in the light of the subject matter, the apparent object or purpose of the parties, and the conditions existing when it was executed.

> *Ralston v. Ralston*, 55 A.3d 726, 742 (Pa. Super. 2012) (citing *Consolidation Coal Co. v. White*, 875 A.2d 318, 326-27 (Pa. Super. 2005)).

12

3. "Where the language of the Deed is clear and unambiguous, the intent of the grantees must be gleaned solely from the deed's language," *Estate of Reigle*, 438 Pa. Super. 361, 363, 652 A.2d 853, 854 (Pa. Super. 1995)(citations omitted), "as gathered from a reading of the entire deed." *Empire Coal Min. & Dev., Inc. v. Dep't of Envtl. Res.*, 678 A.2d 1218, 1222 (Pa. Cmwlth. 1996).

4. "If the deed is ambiguous, then all of the attending circumstances existing at the time of the execution of the instrument should be considered to aid in determining the apparent object of the parties." *Stewart v. Chernicky*, 439 Pa. 43, 266 A.2d 259, 263 (1970); *accord Clancy v. Recker*, 455 Pa. 452, 316 A.2d 898, 902 (1974).

5. Whether a deed is ambiguous is a question of law for the court. *Pa. Elec. Co. v. Waltman*, 670 A.2d 1165, 1169 (Pa. Super. 1995).

6. When an ambiguity exists, "parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances." *Miller v. Poole*, 45 A.3d 1143, 1146 (Pa. Super. 2012).

7. Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement of contractual terms. *Kaplan v. Cablevision of Pa., Inc.*, 448 Pa. Super. 306, 671 A.2d 716, 722 (1996), *appeal denied*, 546 Pa. 645, 683 A.2d 883 (1996), citing, *inter alia, Somers v. Somers*, 418 Pa. Super. 131, 613 A.2d 1211, 1213 (1992), *appeal denied*, 533 Pa. 652, 624 A.2d 111 (1993).

8. Good faith has been defined as "honesty in fact in the conduct or transaction concerned." *Kaplan*, 671 A.2d 111 (1993).

13

9. "A fee simple subject to a condition subsequent is created where the deed provides that upon the happening of some specified event, the grantor has the right and power to terminate the estate." *Emrick v. Bethlehem Tp.*, 485 A.2d 736, 739 (Pa. 1984).

10. A fee simple subject to a condition subsequent is not subject to the Rule Against Perpetuities. *Id.*

11. A Fraternity House or Chapter House is commonly accepted and understood to be a place where undergraduate members of a fraternity reside while attending a college or university. *Delta Psi Fraternity v. City of Burlington*, 969 A.2d 54, 57 (Vt. 2008)([T]he term "Fraternity house," which is not defined by statute, could nevertheless be construed to impose a residential use requirement; many common definitions of "house" imply use as a residence); *Muhlenberg College Appeal*, 44 Pa. D. & C.2d 579, 591 (Lehigh Cty. Nov. 12, 1966) (If dormitories on a college campus are within the scope of the tax exemption statute, and they clearly are, it becomes difficult to see why fraternity houses, which are primarily a form of dormitory are not also within the scope of the exemption statute.); *see also, Ballentine's Law Dictionary*, which defines fraternity as an organization of college students, usually providing living quarters for the members).

## DISCUSSION

In its Complaint for Specific Performance, the University asserts the condition subsequent provided for in the 1928 Deed has occurred, thereby triggering the University's right to purchase. In order to determine whether the condition subsequent has occurred, the Court must ascertain and effectuate what the parties intended at the time the 1928 Deed was executed. To do so, the Court looks to the applicable rules of construction.

14

As to the first rule of construction, the nature and quantity of the interest conveyed must be ascertained from the 1928 Deed itself. As discussed in this Court's Opinion and Order, filed March 22, 2019, the 1928 Deed states that the premises is being transferred in fee to the House Corp., subject only to the potential termination of that fee estate if the premises is no longer being used as a Chapter or Fraternity House of Beta Theta Pi. In that event, the University has the right to terminate the estate upon payment of a purchase price set by the parties or, in the absence of such an agreement, a purchase price set by arbitrators agreed upon by the parties.

As to the second rule of construction, effect must be given to the language of the 1928 Deed in its entirety, and no portion may be unreasonably rejected. The "express purpose clause" of the 1928 Deed states:

> **It is hereby expressly stipulated that this conveyance is made for the express purpose of the erection and perpetual maintenance by the said party of the second part hereto of a Fraternity or Chapter House for the use of the members of the said Chapter of the said Fraternity,** and that the erection and maintenance thereof is a condition of this conveyance and that this conveyance is also made subject to the exceptions and reservations next hereinafter set forth.

[PSU 9, 0002-0003](emphasis added). The University asserts the only reasonable interpretation of the express purpose clause is that the conveyance between the University and the House Corp. was made for the construction and maintenance of a Fraternity or Chapter House for use by members of the Active Chapter of Beta Theta Pi. The Court agrees, finding "the said Chapter of said Fraternity" to be in reference to the Active Chapter, not the House Corp. Further, the Court rejects the House Corp.'s assertion that "the said Chapter of said Fraternity" is referring to the House Corp. *and* the Active Chapter, as the First Reservation Clause contained in the 1928 Deed clearly distinguishes between the two. Additionally, the Court finds this interpretation consistent with the

15

commonly accepted definition of a Fraternity House or Chapter House as a place where undergraduate members of a fraternity reside while attending a college or university. *Delta Psi Fraternity v. City of Burlington,* 969 A.2d 54, 57 (Vt. 2008).

As to the third rule of construction, if a doubt arises concerning the interpretation of the instrument, it will be resolved against the party who prepared it. Instantly, the Court finds this rule inapplicable as it finds the 1928 Deed contains no genuine doubt as to its interpretation. As to the fourth rule of construction, the language of the 1928 Deed should be interpreted in light of the subject matter, the apparent object or purpose of the parties, and the conditions existing at the time the 1928 Deed was executed. For this final rule of construction, the Court finds the testimony of Esposito and the archival material presented by the University relevant. As discussed, in January of 1888 the University's Board of Trustees lifted the prohibition against fraternities in response to the University's housing shortage. At this time, there was only one (1) on-campus housing option for undergraduate students. In addition to fraternity houses, the University's' Board of Trustees began examining the possibility of on-campus dormitories for its undergraduate students. Communications between founding members of Beta Theta Pi and the University's Board of Trustees establish a mutual understanding that the construction of the fraternity housing on-campus would benefit the University's undergraduate student population. In addition to the 1928 Deed to the subject Property, the University entered into other deeds with fraternity-related housing corporations for the express purpose of maintaining housing for its respective active chapters. Included in each deed was a provision reserving the University's right to purchase the property at issue if it ceased to be used for the purpose of providing housing for the various housing corporation's respective active chapters.

16

Therefore, the Court concludes the plain language of the 1928 Deed, when read in its entirety, contemplates that the conveyance to the House Corp. by the University was for the express purpose of the construction and maintenance of a Chapter or Fraternity House for use by Active Chapter Members of Beta Theta Pi. In order to determine whether the House Corp. is in breach of the 1928 Deed, thereby triggering the University's right to purchase, the Court looks to the current use of the Property. As discussed, the Charter of Beta Theta Pi at the University was suspended and the Active Chapter of Beta Theta Pi at the University was disbanded in response to the death of Piazza in February of 2017. On February 21, 2017, the House Corp.'s Board held a unanimous vote to require the Active Chapter vacate the Property on or before March 4, 2017. Since that time, the Property has not been used as a home for Active Chapter members. Currently, the only individual residing in the Property is a son of a dues paying House Corp. member. The individual has no personal affiliation with Beta Theta Pi. In addition to this individual, dues paying members of the House Corp. intermittently use the Property for Board meetings, or as temporary accommodations—akin to hotel accommodations—during home football weekends and other special events. It is clear to this Court that such use does not constitute use as a Fraternity or Chapter House under the 1928 Deed. Accordingly, the Court finds the University's right to purchase the Property has been triggered.

Although it appears to this Court that the House Corp. desires something more happen with the Property, such as recolonization, such a desire is not enough to overcome the fact that the condition subsequent has occurred. The House Corp. is a non-profit organization. It is not a fraternity. It cannot control the reestablishment of the Active Chapter at the University nor can it institute recolonization of a new chapter at the University. Such a decision remains at the discretion of the General Fraternity and no evidence was presented to the Court indicating any intention on

17

behalf of the General Fraternity to change or alter the status of the Alpha Upsilon Chapter at the University since the Active Chapter was vacated in March of 2017.

In regards to the duty of good faith and fair dealing, the Court does not find the University breached any applicable duty in its decision to enforce the deed provisions. As discussed, the University permanently revoked recognition of Beta Theta Pi in March, 2017. No testimony was presented indicating the University revoked recognition in order to purchase the Property. Instead, it is clear to this Court the University's decision to revoke was due to the actions of the Active Chapter that led to the death of Piazza, a student of the University. Additionally, as indicated in Rundle's testimony, the University's revocation had no effect on the National Fraternity's decision to suspend the Active Charter and disband the Active Chapter. Further, of significant importance, it was the decision of the House Corp. Board to evict the Active Chapter from the Property in March, 2017. Given these circumstances, the Court finds the University clearly had the right to enforce the deed provision contained in the 1928 Deed and that doing so was not in violation of the duty of good faith and fair dealing.

Accordingly, the Court enters the following Verdict:

18

## VERDICT

AND NOW, this 21st day of December, 2021, the Court enters the following Verdict in favor of Plaintiff and Orders as follows:

1. Judgment is entered in favor of Plaintiff on its Complaint for Specific Performance, and ownership of the subject premises shall be transferred back to Plaintiff in accordance with the provisions set forth below;

2. Once this verdict becomes final, the parties shall have six (6) months to attempt to negotiate a transfer price for the subject property. For these purposes, Defendant shall afford Plaintiff, and any necessary designee of Plaintiff, reasonable access to the subject premises for purposes of appraising the fair market value of the property. The parties may waive the six (6) month period for negotiation by written agreement and proceed as they may agree, or in the absence of an agreement as to how to proceed, as set forth hereinafter.

3. Following the expiration of the period described in paragraph 2 above, whether by the lapse of time or upon the agreement of the parties, the parties shall have two (2) months to agree upon the number of and identity of the members of a Board of Arbitrators to determine the transfer price of the subject property.

4. If an impasse should arise regarding the number of and/or identity of arbitrators, either party may file a Praecipe for a hearing before the Court where the Court will set the number of arbitrators and/or determine the identity of said arbitrators, as may be necessary. In the event of a future hearing to set the

19

identities of the members of a Board of Arbitrators, each party shall nominate two (2) arbitrators by filing the same with the Prothonotary of Centre County at least ten (10) days before the scheduled hearing and serve a copy of said filing on the Court.

BY THE COURT:

Brian K. Marshall, Judge

20